COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-06-353-CV

 

 

FOX ENTERTAINMENT
GROUP, INC.,                                    APPELLANTS

FOX BROADCASTING COMPANY, 

FOX NEWS, INC., 

FOX NEWS NETWORK, INC., 

FOX NEWS NETWORK, L.L.C., 

FOX NEWS HOLDINGS, INC., 

AND BILL O=REILLY                                                                              

 

                                                   V.

 

GAMAL ABDEL-HAFIZ                                                             APPELLEE

 

                                              ------------

 

            FROM
THE 96TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                OPINION
ON REHEARING

 

                                              ------------

We grant Appellants= motion for rehearing, withdraw our August 31, 2007 opinion and
judgment, and substitute the following.








Appellant FOX brings this
interlocutory appeal of the trial court=s order denying its motion for traditional and no‑evidence
summary judgment.[1]
 See Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(6) (Vernon Supp. 2006). 
We reverse and render.

BACKGROUND

Gamal Abdel-Hafiz (AAppellee@), born and
educated in Egypt, came to the United States (AU.S.@) to work in
1984 and became a U.S. citizen in March 1990. 
He became a language specialist with the Federal Bureau of
Investigations (AFBI@) in January 1994 and then a special agent in the Dallas FBI
office.  He was assigned to the Dallas
FBI office=s
international terrorism unit from 1996 to 2001 and served as assistant legal
attache to the U.S. Embassy in Saudi Arabia from 2001 to 2003.  He was recalled from Saudi Arabia by the FBI
in February 2003 for an administrative inquiry into insurance fraud allegations
made by his ex-wife.  This investigation
led to his termination; the FBI later reinstated him.








The underlying suit is a defamation
action.  The alleged defamation involves
statements initially made by FBI agents Robert (ABob@) Wright and
John Vincent, of the FBI=s terrorism
unit in Chicago, assistant U.S. attorney Mark Flessner, also based in Chicago,
and FBI agent Barry Carmody, of the FBI=s terrorism unit in Tampa, about Appellee with regard to FBI
investigations in 1998 and 1999.  Bill O=Reilly, host of THE O=REILLY FACTOR, a television program
on the FOX television network, interviewed Flessner on March 4, 2003, and
interviewed former FBI assistant director Bill Baker and former FBI agent Gary
Aldrich about Flessner and Wright=s allegations against Appellee, among other topics, on March 5,
2003.  On March 6, 2003, O=Reilly also interviewed Vincent and David Schippers, Vincent and
Wright=s attorney.








Appellee sued Appellant for
libel per se, slander per se, libel per quod, slander per quod, statutory
libel, and libel and slander by innuendo and implication based on statements
made in the three broadcasts and in the broadcast transcripts posted on FOX=s website (collectively, the ABroadcasts@).  He further contended that the Broadcasts Aomitted material facts and/or juxtaposed facts in a material way such
that the gist of the publications . . . was false,@ and listed twelve statements made by O=Reilly as defamatory.[2]  Appellee sought $3.5 million in compensatory
damages plus exemplary damages.  We have
reordered these statements chronologically:

Statement Three: [March 4, 2003] In the AImpact@ segment
tonight, very disturbing story.  Charges
that an FBI agent named Gamal Abdel Hafiz (ph) refused to wear a recording
device in terrorist investigations of accused money men, Yassin Al‑Kadi[[3]]
and Sami Al‑Arian.

Statement
Ten: [March 5, 2003] Should FBI Chief Robert Mueller be fired over the
scandal of a Muslim agent who failed to aggressively investigate terrorism?

 

Statement
Eleven: [March 5, 2003] And THE FACTOR has two eyewitnesses who say Mr.
Hafiz refused to wear a wire twice during terror investigations.

 








Statement
Four: [March 5, 2003] According to FBI agent Robert Wright and former
federal prosecutor Mark Flesser, Hafiz declined to secretly tape a Saudi
citizen named Yassin Kadi, who was suspected of financing Usama bin Laden.[[4]]  That incident happened in April of 1999, and
it happened again during the investigation of Sami Al‑Arian, according to
the two men.  Wright says Hafiz told
people, quote, Aa
Muslim does not record another Muslim.@  That is not true.  Hundreds of Muslim American law enforcement
agents have worn wires, according to FACTOR sources.

 

Statement
Five: [March 5, 2003] But THE FACTOR has learned that Hafiz is being investigated
by the office of professional responsibility at the Justice Department.  That=s serious.

 

Statement Six: [March 5, 2003] In THE FACTOR AFollow‑Up@ segment
tonight, as we told you in the @Talking Points@ memo, an
FBI agent named Gamal Abdel‑Hafiz has been put on administrative
leave.  He has been accused by another
agent of refusing to record other Muslims who the FBI was investigating.  One of the men, a Saudi named Yassin Kadi, is
suspected of bankrolling Usama bin Laden. 
The other man was Sami Al‑Arian[,] recently indicted for terrorist
fund‑raising.

Statement
Twelve [the same statement as Statement Two]: [March 5, 2003] How do you
know that, because we=re
being told by the Prosecutor in the case and Agent Wright that everybody wanted
this to happen.  The Tampa office in the
Al-Arian case asked the man to wear a wire. 
He declined.

 

Statement
Two: [March 5, 2003] The Tampa office . . . asked the man to wear a
wire.  He declined.

 

Statement
Seven: [March 5, 2003] ICI just want toCI
want the audience to know, Mr. Baker, that what you say, although it might be
true, is being vehemently disputedCvehemently disputedCby a
number of FBI agents involved in these investigations.

 

Statement
Eight: [March 5, 2003] If you have one that says, I=m not
going to record another fellow Muslim, you=ve got to fire him, don=t
you?

 

Statement
Nine: [March 6, 2003] This is Hafiz (ph) who refused to record Sami
Al-Arian (ph). . . . Listen, we know the truth. 
The truth is I believe your two agents here, the guy wouldn=t
tape other Muslims.  That=s the
truth.  And he wasn=t
disciplined. . . . But he should have been disciplined, and he wasn=t.








Statement
One [the same statement as Statement Nine]:  [March 6, 2003] Listen, we know the
truth.  The truth is, I believe your two
agents here, the guy wouldn=t tape other Muslims.  That=s the truth.  And he wasn=t
disciplined.

 

As Statements One and Two duplicate portions of
Statements Nine and Twelve, we will consider them subsumed within our
discussion of Statements Nine and Twelve and we will not analyze them
individually.

It is undisputed that around
April 1999, Wright, Vincent, and Flessner asked Appellee to secretly record a
Muslim suspect in an FBI investigation code‑named AVulgar Betrayal.@  Vulgar Betrayal=s mission was Ato identify
and neutralize through criminal process the HAMAS terrorist support
organization located within the United States.@[5]

SUMMARY JUDGMENT

Standard of
Review








After an adequate time for
discovery, the party without the burden of proof may, without presenting
evidence, move for summary judgment on the ground that there is no evidence to
support an essential element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d
193, 207 (Tex. 2002).  When reviewing a
no-evidence summary judgment, we examine the entire record in the light most
favorable to the nonmovant, indulging every reasonable inference and resolving
any doubts against the movant.  Sudan
v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006). 
The trial court must grant the motion unless the nonmovant produces
summary judgment evidence that raises a genuine issue of material fact.  See Tex.
R. Civ. P. 166a(i) & cmt.; Sw. Elec. Power Co. v. Grant,
73 S.W.3d 211, 215 (Tex. 2002).  If the
nonmovant brings forward more than a scintilla of probative evidence that
raises a genuine issue of material fact, then a no evidence summary judgment is
not proper.  Moore v. K Mart Corp.,
981 S.W.2d 266, 269 (Tex. App.CSan Antonio 1998, pet. denied). 
ALess than a scintilla@ exists when the evidence is so weak as to do no more than create a
mere surmise or suspicion of a fact.  King
Ranch v. Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541
U.S. 1030 (2004).  AMore than a scintilla@ exists if it would allow reasonable and fair‑minded people to
differ in their conclusions.  Id.  








Texas Rule of Civil Procedure
166a does not prohibit a party from combining in a single motion a request for
traditional summary judgment and  a
request for no-evidence summary judgment. 
See Tex. R. Civ. P. 166a(c),
(i); Binur v. Jacobo, 135 S.W.3d 646, 650 (Tex. 2004).  When, as here, a party moves for summary
judgment under both rules 166a(c) and 166a(i), we will first review the trial
court=s judgment under the no-evidence standards of rule 166a(i).  Ford Motor Co. v. Ridgway, 135 S.W.3d
598, 600 (Tex. 2004).  If the non‑movant
failed to produce more than a scintilla of evidence under that burden, then
there is no need to analyze whether the movant=s summary judgment proof satisfied the traditional summary judgment
test of rule 166a(c).  Id.  On appeal from the denial of a summary
judgment, we may reverse and render judgment if any of the grounds stated in
the movant=s motion are
meritorious.  See HBO, A Div. of Time
Warner Entm=t Co., L.P.
v. Huckabee, 995 S.W.2d 152, 163 (Tex.
App.CHouston [14th Dist.] 1998), aff=d, 19 S.W.3d 413 (Tex. 2000).

Defamation








Appellee sued Appellant under
various defamation theories.  To maintain
any of his defamation claims, Appellee had the burden to prove that Appellant:
(1) published a statement; (2) that was defamatory concerning Appellee; (3)
while acting with either actual malice, if Appellee was a public official or
public figure, or negligence, if he was a private individual, regarding the
statement=s
truth.  WFAA‑TV, Inc. v. McLemore,
978 S.W.2d 568, 571 (Tex. 1998), cert. denied, 526 U.S. 1051
(1999).  Neither party disputes that
Appellant published the statements at issue. 
Based on the parties= summary judgment pleadings presented to the trial court, we confine
our review here to the Aactual
malice@ standard.[6]

Constitutional AActual Malice@








In issue four, Appellant
asserts that there is no evidence that the challenged statements were published
with constitutional Aactual
malice.@[7]  A no-evidence summary judgment
would be improper only if we conclude, after examining the entire record, that
Appellee has presented evidence creating more than a surmise or suspicion that
Appellant published the statements with actual malice.  See Sudan, 199 S.W.3d at 292; King
Ranch, 118 S.W.3d at 751.








AActual
malice@ in the defamation sense does not include ill will, spite, or evil
motive.  Casso v. Brand, 776
S.W.2d 551, 558 (Tex. 1989).  Rather, to
establish actual malice, the plaintiff must prove that the defendant published
a defamatory falsehood Awith
knowledge that it was false or with reckless disregard of whether it was false
or not.@  WFAA‑TV, 978
S.W.2d at 571 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 279‑80,
84 S. Ct. 710, 726 (1964)).  The actual
malice standard=s purpose is
to protect innocent but erroneous speech on public issues, while deterring Acalculated falsehoods.@  Turner, 38 S.W.3d at
120 (citing Garrison v. Louisiana, 379 U.S. 64, 75, 85 S. Ct. 209, 216
(1964)); see also New York Times, 376 U.S. at 270, 84 S. Ct. at 721
(stating that defamation cases must be considered Aagainst the background of a profound national commitment to the
principle that debate on public issues should be uninhibited, robust, and wide‑open,
and that it may well include vehement, caustic, and sometimes unpleasantly
sharp attacks on government and public officials@).  To prevail at trial, a
public figure plaintiff must establish actual malice by clear and convincing
evidence, but the Texas Supreme Court has declined to adopt the clear‑and‑convincing
standard at the summary judgment stage.  Huckabee
v. Time Warner Entm=t Co., 19 S.W.3d 413, 420-21 (Tex.
2000).

The meaning of terms such as Aactual malice@Cand, more particularly, Areckless disregard@Cis not readily captured in one infallible definition.  St. Amant v. Thompson, 390 U.S. 727,
730, 88 S. Ct. 1323, 1325 (1968).  And
while knowledge of falsity is a relatively clear standard, reckless disregard
is much less so.  See, e.g., Bentley,
94 S.W.3d at 591 (reviewing U.S. Supreme Court cases on actual malice).  Reckless disregard is a subjective standard
that requires the plaintiff to bring forth evidence that the defendant
entertained serious doubts as to the truth of the publication at the time it
was published.  Hearst Corp. v. Skeen,
159 S.W.3d 633, 637 (Tex. 2005); see also Harte‑Hanks Commuc=ns, Inc. v. Connaughton, 491 U.S.
657, 688, 109 S. Ct. 2678, 2696 (1989) (stating that reckless disregard
involves a Ahigh degree
of awareness of probable falsity@); St. Amant, 390 U.S. at 731, 88 S. Ct. at 1325 (stating that
there must be sufficient evidence to permit the conclusion that the defendant
in fact entertained serious doubts as to the truth of his publication).  And a publisher=s presentation of facts may be misleading, even negligently so, but
will not constitute a Acalculated
falsehood@ unless the
publisher knows or strongly suspects that it is misleading.  Turner v. KTRK Television, Inc., 38
S.W.3d 103, 120 (Tex. 2000).








Actual malice focuses on the
defendant=s state of
mind, particularly his attitude toward the truth of what he reported, which a
plaintiff can prove through objective evidence about the publication=s circumstances and the defendant=s conduct at the time of publication. 
Id.; WFAA-TV, Inc., 978 S.W.2d at 573; see also Bentley,
94 S.W.3d at 591, 596 (stating that defendant=s lack of care and motive are factors to consider).  When the defendant=s words lend themselves to more than one interpretation, the plaintiff
must establish either that the defendant knew that the words would convey a
defamatory message, or had reckless disregard for their effect.  New Times, Inc. v. Isaacks, 146 S.W.3d
144, 162 (Tex. 2004), cert. denied, 545 U.S. 1105 (2005).  Publications alleged to be defamatory must be
viewed as a wholeCincluding
accompanying statements, headlines, pictures, and the general tenor and
reputation of the source itself, and we consider the actual malice issue within
this context.  See City of Keller v.
Wilson, 168 S.W.3d 802, 811 (Tex. 2005) (citing New Times, Inc., 146
S.W.3d at 158-59 for the proposition, with regard to a no-evidence assertion,
that legal sufficiency cannot disregard parts of a publication, considering
only false statements to support a plaintiff=s verdict or only true ones to support a defense verdict).

 

 








The Broadcasts

We have reviewed the
Broadcasts in their entirety.  Based on
the three broadcasts, the format of O=Reilly=s show
involved various segments, with transition blurbs about upcoming information in
the broadcast between each segment.  We
have summarized the unrelated portions of the broadcasts for context, but we
have included in their entirety the portions of the transcripts that include
the alleged defamatory statements, bolding the contested statements within
each.[8]

THE O=REILLY FACTOR, March 4,
2003








In the Introduction segment,
O=Reilly gave his evening=s topics as ATrust the
U.N.?@ with regard to pre-war decision-making, AMuslim Agent Trouble,@ stating that there were charges that an FBI agent of Arab descent
refused to wear a wire while investigating Sami Al-Arian, and APro-Saddam Prof?@ about a
professor accused of funneling money to Saddam Hussein.  In his Talking Points segment, O=Reilly talked about the need to take action on terrorism.  In the Top Story segment, O=Reilly conducted an interview with the Washington editor of The
Nation about al-Qaeda and Iraq.  The
transition blurb was APro
Sami-Agent?@ in which O=Reilly again mentioned the refusal of an FBI agent to wear a wire when
investigating Sami Al-Arian.  In the
Factor Follow-Up, O=Reilly
discussed al-Qaeda with a FOX foreign affairs analyst.  In the transition blurb, Sami Al-Arian was
mentioned again.

In the Impact segment, an
interview lasting approximately five minutes, O=Reilly showed FBI Chief Robert Mueller=s photo and then conducted a split screen interview between himself
and Flessner.

O=REILLY:
          In the AImpact@
segment tonight, very disturbing story. 
Charges that an FBI agent named Amal Abdel Hafiz (ph) refused to wear a
recording device in terrorist investigations of accused money men Yassin
Al-Kadi and Sami Al-Arian. [Statement Three]

 

Kadi was being investigated for activities surrounding the bombing of
an American embassy in Africa.  He lives
in Saudi Arabia.

 

Al-Arian, as you may know, has been charged with raising money for
Palestinian Islamic Jihad.

 

Last week the FBI put Hafiz on leave but denies he refused to wear the
wire.

 

Now we were supposed to have FBI counter-terrorism agent Robert
Wright, who worked with Hafiz, as our guest this evening, but FBI chief Robert
Mueller threatened to fire him if he appeared on THE FACTOR. That happened
about an hour ago.

 

As you may remember, we selected Mueller as one of our villains of the
week for his dubious decisions, and once again, Mueller has lived down to our
expectations.

 








Joining us now from Chicago is former federal prosecutor Mark
Flessner, who worked with Mr. Wright on the Kadi case.  What=s FBI trying to hide here,
counselor?

 

FLESSNER:         Well, I can=t
tell that.  I=m not
privy to what the reason is that they have suspended Special Agent Al-Hafiz,
but clearly, there=s
something big going on, since they=re [sic] recalled him for
re-op.

 

O=REILLY:
          Do you believe that this agent
did not wear the wire?

 

FLESSNER:         Do I believe that Special Agent Al-Hafiz
did not wear the wire?

 

O=REILLY:
          Yes.

 

FLESSNER:         Well, I was involved, of course, as you
know that I was the prosecuting investigator, the attorney on the case during
the investigation.  The lead AUSA,
assistant U.S. attorney.  I was working
with . . . FBI Agent Robert Wright and about 13 other actual FBI agents.

 

I was involved in the conversations and in the negotiations with Amal
Abdel Al-Hafiz during the time in which we requested him to wire up on the
target or one of the targets of the investigation coming out of a company out
of New Jersey.  And if the question is do
I believe it, I was there for it and there are some times when I think about
that point in my life and can=t believe it actually
happened.

 

O=REILLY:
          So Hafiz, the FBI agent, all right?  The FBI agent, Hafiz, flat out said I=m not
wearing a wire.  Now why did he say that?

 

FLESSNER:         Well, let me just give you a little
background to the story.  He had been
approached byCa
number of subpoenas had been issued, one to a company, BMI in New Jersey.  And an employee of that company contacted
Al-Hafiz and asked him what the nature of the investigation was.

 








We were thrilled when Special Agent Hafiz contacted us and told us
that he had been contacted with respect to the nature of the investigation,
because we assumed that someone who wanted to know why he was to testify or
what the nature of the investigation was is that he wanted to do something other
than to tell the truth.  

 

We asked Al-Hafiz to wire up, to go to the meeting, and to record the
conversations and find out what the guy wanted to know about the
investigation.  

 

There was a number of phone calls, both with Special Agent Hafiz and
with his supervisor, and there was a number of correspondences that went back
between the special agents in charge in Chicago . . . 

 

O=REILLY:
          Bottom line, though?

 

FLESSNER:         Bottom line is, he said, AI do
not record another Muslim.  That is
against my religion.@

 

O=REILLY:
          Really? And the same thing with
Sami Al-Arian in Florida?

 

FLESSNER:         My understandingCI
wasn=t
involved . . . 

 

O=REILLY:
          That=s
what Wright said.  That=s
what Wright was going to tell us until he got pulled.

 

Now, since you heard itCSince you heard it, you were
there, are you surprised the FBI is denying it happened?

 








FLESSNER:         Well, I received a copy of that press
release from the FBI last December.[[9]]  They allege that the reason that Special
Agent Al-Hafiz refused to cooperate with the investigationCwhich
by the way that=s the
first time I have ever known an FBI agent to refuse to cooperate with an
investigationCthey
said the reason he refused is because we had requested that he make the
recording in a mosque, which was simply not true.

 

O=REILLY:
          Yes, that=s not
true.

 

So, look, the FBI, according to your testimony and Wright=s
testimony, is covering this up because this is an embarrassment to them.  And Mueller, again, we don=t
trust him.  Flat out don=t
trust him.  And this is another
embarrassment for the FBI.

 

Now, Wright was told that they would fire him if he came on THE
FACTOR, but they can=t
fire him now, right?

 

FLESSNER:         Well, what they do with respect to this
I don=t know.  Just in defense of Director Mueller . . .

 

O=REILLY:
          I=m not
going to let you defend him because I only have 30 seconds.  

 

He was not director then, but he is director now, Mr. Flessner.

 

FLESSNER:         That=s right.

 

O=REILLY:
          And he said flat out to Wright
one hour ago, you go on THE O=REILLY FACTOR, you=re
toast.  That=s a
disgrace.

 

We appreciate your testimony. 
Thanks very much.

 

FLESSNER:         Thank you.








O=REILLY:
          Something very wrong at the FBI.

 

Plenty more ahead as THE
FACTOR moves along this evening.  Another
college professor accused of raising money for the wrong guy, Saddam.  We=ll tell you what happened in a moment.

In the next transition blurb,
entitled AKilling the
pledge?,@ O=Reilly
asked, AWill a liberal federal court succeed in killing the Pledge of
Allegiance as we know it?@  The Unresolved Problem segment followed, in
which the attorney of a professor who had been terminated from his university
position after he was charged with funneling money to Saddam Hussein discussed
his client=s situation
with O=Reilly.








The next interview was with a
Vanity Fair special correspondent about Michael Jackson=s charitable contributions or lack thereof and her allegations that he
founded charities to get close to children. 
The Back of the Book segment addressed the pledge issue with regard to
the Ninth Circuit=s
controversial Aunder God@ ruling.[10]  O=Reilly interviewed a reverend from the American Family Association
about his petition to amend the U.S. Constitution to keep the words Aunder God@ in the
Pledge of Allegiance.  He also
interviewed a constitutional law expert about Aactivist judges.@  Near the end of the show, O=Reilly responded to email from viewers.

THE O=REILLY FACTOR, March 5,
2003

In the Introduction segment,
O=Reilly stated: 

The O=REILLY
FACTOR is on.  Tonight, there=s
growing hostility against the USA inside the United Nations.  Will the Bush Administration walk away next
week and take care of Iraq outside that body? 
The pope says a war against Iraq would be immoral.  But does the pontiff still have the moral
authority to make that call?  Should
FBI Chief Robert Mueller be fired over the scandal of a Muslim agent who failed
to aggressively investigate terrorism? [Statement Ten] Caution: you=re
about to enter the no spin zone.  THE
FACTOR begins in 90 seconds. 

 

O=REILLY:   Hi, I=m Bill O=Reilly.  Thank you for watching us tonight.

 

All hell is breaking loose inside the FBI.  That=s the subject of this evening=s ATalking
Points@
memo.  

 

We sat on the story for quite awhile. 
But now FBI Agent Gamal Abdel‑Hafiz has been put on administrative
leave.  And THE FACTOR has two
eyewitnesses who say Mr. Hafiz refused to wear a wire twice during terror
investigations. [Statement Eleven]

 

According to FBI agent Robert Wright and former
federal prosecutor Mark Flessner, Hafiz declined to secretly tape a Saudi
citizen named Yassin Kadi, who was suspected of financing Usama bin Laden.

 

That incident happened in April of 1999, and it
happened again during the investigation of Sami Al-Arian, according to the two
men.

 








Wright says Hafiz told people, quote, AA
Muslim does not record another Muslim.@  That is not true.  Hundreds of Muslim American law enforcement
agents have worn wires, according to FACTOR sources. [Statement
Four] 

 

Agent Hafiz apparently denies any wrongdoing and has filed an equal
opportunity complaint against Agent Wright. 
A short time later Hafiz was promoted to the FBI=s
office in Saudi Arabia but again, he=s now been called back here
and placed on forced leave.  Why?  The FBI will not say.  

 

But THE FACTOR has learned that Hafiz is being
investigated by the office of professional responsibility at the Justice
Department.  That=s
serious. [Statement Five]

 

The simple question is this. 
Did Agent Hafiz refuse to secretly tape other Muslims involved in terror
investigations, yes or no?  

 

Now, this is the third time that FBI chief Robert Mueller has been in
the vicinity of a scandal.  And enough
might be enough.  He was a federal
prosecutor in Boston when the FBI allowed three innocent men to stay in prison
to protect an informant who had committed murder.

 

Mueller rewarded FBI Agent Spike Bowman with special praise after Mr.
Bowman refused a request from the FBI=s Minneapolis office to
search accused terrorist Zacarias Moussoui=s computer in the months
before 9-11.  Moussoui, of course, is now
being charged with being in on the mass murder at the World Trade Center and
Pentagon.

 

FBI Agent Colleen Rowley was so outraged by that screw-up she put her
career in jeopardy and made the situation public.  But Rowley was not commended by Mueller; the
guy who messed up, Bowman, was.

 

And now we have Gamal Abdel-Hafiz. 
Unless director Mueller can fully explain this situation to the American
people ATalking
Points@
believes he should be fired by President Bush.

 








Americans are depending on the FBI to protect them and there is
growing evidence that Mueller is a bureaucratic nightmare.  The FBI, we believe, is now doing an
excellent job in fighting terrorism, and most field agents are
magnificent.  But did you know that many
of those agents refer to Mueller=s Washington group as Ahindquarters@
instead of Aheadquarters@?

 

Americans have a right to know what=s happening when serious
charges are leveled against a government agency.

 

Agent Wright is writing a book, but was told he would be charged with
insubordination if he appeared on THE FACTOR last night.  That=s a very disturbing threat.

 

Bottom line.  We need to know if
Agent Hafiz refused to wear a wire during a terrorism investigation and why he
was subsequently promoted.  If the
government will not answer that simple question, we are all in big trouble.

 

We=ll have more on this coming up. 
And that=s the memo. 

The Top Story segment
addressed the Iraq situation.  The
transition blurbs were: ACredibility
Problem@ with regard to the Pope and APeace Shirt Ban.@  In the Unresolved Problems segment, O=Reilly talked about Pope John Paul II=s stance on an invasion of Iraq as immoral and interviewed a professor
about the Catholic priest sex scandal and its impact on the Pope=s moral authority.








The next transition blurb was
ANo Peace Shirts?@ and another
remark, in the form of a rhetorical question, about FBI embarrassment with
regard to an agent who apparently refused to wear a wire when talking with
suspected terrorists.  The next segment
was an interview with a man and his son who had been arrested for wearing peace
shirts in a mall food court.  The next
transition blurbs were AHillary on
the War@ and AFire
Mueller?@  In the Personal Story segment,
O=Reilly conducted an interview with a journalist about Hillary Clinton=s stance on potential war with Iraq. 
The transitional blurb was ADismiss Mueller?  Scandal
involving Muslim agent.@

In the Factor Follow‑Up,
O=Reilly showed a picture of the FBI seal first, then photos of Yassin
Al‑Kadi, Sami Al‑Arian, and Mueller.

O=REILLY:   Thanks for staying with us.  I=m Bill O=Reilly.  In THE FACTOR AFollow-Up@
Segment tonight, as we told you in the ATalking
Points@
memo, an FBI Agent named Gamal Abdel-Hafiz has been put on administrative
leave.  He has been accused by another
agent of refusing to record other Muslims who the FBI was investigating. 

 

One of the men, a Saudi named Yassin Kadi, is
suspected of bankrolling Usama bin Laden. 
The other man was Sami Al-Arian recently indicted for terrorist
fund-raising. [Statement Six]

 

The question: Should FBI Chief Robert Mueller be fired since this is
the third time he=s
been around a scandal within the FBI.

 

Joining us now from Los Angeles, Bill Baker, former FBI assistant
director.  And, in Washington, former FBI
agent Gary Aldrich, author of AUnlimited Access: An FBI
Agent Inside the Clinton White House.@

 

Mr. Baker, let=s go
with you.  Am I being unfair here?

 








BAKER:      A little bit, Bill.  Getting right to the specifics of our Muslim
agent, the decision to wear a wire is not made by a field agent in a case.  Otherwise, he=d
have rogue cases which would be bothering you, rightfully.

 

In this instance, the decision by regulation is to be made by the
special agent in charge.  In this case it
was the Dallas office.  So, regardless of
what it was alleged the agent Gamal may have said, the decision for him to wire
up or not wire up was made by the proper person, and that=s the
agent in charge in Dallas.  

 

O=REILLY:
  How do you know that, because we=re
being told by the prosecutor in the case and Agent Wright that everybody wanted
this to happen.  The Tampa office in the
Al-Arian case asked the man to wear a wire. 
He declined. [Statement Twelve]

 

I mean, you=re basically
putting it back on the bureaucracy, and itCand maybe that=s
true.  I mean, maybe they didn=t
give him a direct order, but, still, doesn=t it disturb you, Mr. Baker,
if a Muslim FBI agent will not record another Muslim FBI agent to bring
evidence about terrorism?  Isn=t
that disturbing to you?

 

BAKER:      If that=s the bottom line, it could
be disturbing, Bill.  But I=m
told otherwise.

 

O=REILLY:   Well, of course, you=re
told . . .

 

BAKER:      I=m told that . . . 

 

O=REILLY:   You know, they=reCthey=re
denying it, but you would have to tellCyou would have to call FBI
Agent Wright a liar and the assistantCnot the assistant but the
prosecutor in the case a liar too.  You=d
have to call them both liars in order to make that case.

 

BAKER:      I=m not calling either a
liar.  I=m
saying that the factsCand
as these facts will spin outCand, believe me, Congress is
going to take a look at this just as you are. 


 

And I=m
here to tell you that, when these facts are laid out plain and simple, it=s
going to be Gamal=s
supervisor who claimedCand
not a headquarters supervisor, not the hindquarters you refer to.  








 

It=s the
field, and the field believed that this was not the proper occasion to wire
someone up.

 

O=REILLY:   All right. Now. . . 

 

BAKER:      These
are sensitive cases, and you sometimes put a wire on.

 

O=REILLY:   ICI
just want toCI want the audience to
know, Mr. Baker, that what you say, although it might be true, is being
vehemently disputedCvehemently disputedCby a
number of FBI agents involved in these investigations.
[Statement Seven]

 

How do you see it, Mr. Aldrich?

 

ALDRICH:   Well, when we worked on undercover agents,
when I was an agent, the number one priority, the criteria, I should say, for
choosing an undercover agent was his willingness or her willingness to go under
cover; and, if you had somebody who didn=t want to go undercover and
wear a wire, in this particular case we=re talking about, you=d be
foolish to force that agent to follow through on an investigation they did not
want to participate in.

 

O=REILLY:   OK, but let=s
face it.  We don=t
have very many Muslim American agents who can infiltrate terrorist
organizations.

 

ALDRICH:   Yes. Well . . .

 

O=REILLY:   If you have one that says, I=m not
going to record another fellow Muslim, you=ve
got to fire him, don=t you? [Statement
Eight] 

 

ALDRICH:   Well, I think it is a question of
insubordination, if this is what, in fact, happened because you use the same
fact situation if a Catholic, for example, refused to participate in an
investigation of abortion clinic protesters. 
You=d
have the same fact situation.

 








O=REILLY:   Yes, I mean, lookCMr.
Baker might be right.  Maybe the [sic]
didn=t doCreceive
a direct order.  I wasn=t
there.  But I=ll
tell you the two men that we had on when Wright. . . .  

 

You know, doesn=t it
disturb you, Mr. Baker, that, number one, the FBI [w]ill not clarify this case,
because it=s a
simple question: Did he or did he not refuse to wear a wire?  Yes or no. 
They will not clarify it.  

 

And, number two, we were going to have Wright on last night, and they
threatened to fire him for insubordination if he came on and told his
story.  Doesn=t
that disturb you, sir?

 

BAKER:      No, I=m not necessarily disturbed
by that, Bill.  You=ve
got facts right now, and the FBI has a mandate to follow its procedures.  This is all going to be laid out. You=re
ahead of the curve here, and you have an issue.

 

But I=d
like to tell Gary also that one of the best undercover agents the FBI hadCand
they made a movie out of itCDonny Brasco was his code
nameCwas
very hesitant to wear a wire.  So I don=t
want to debate . . .

 

O=REILLY:   Yes, because he didn=t
want to get . . .

 

BAKER:      . . . whether . . .

 

O=REILLY:   He didn=t want to get killed.  I understand that . . .

 

BAKER:      Absolutely.

 

O=REILLY:   . . . but that=s
part of the job.

 

Now, listen, Mr. Baker, one more and we=ll
get back to Mr. Aldrich.  Doesn=t it
disturb you about Mueller that this guy gave this Bowman a commendation and
gave Rowley a hard time in Minneapolis about the Moussaoui thing?

 








BAKER:      Last night, Bill, you mentioned that this
is the worst of times.  Even in the best
of times, an FBI director has one of the most challenging positions in
government.  He=s
looking over 75,000 cases and over 25,000 employees, and he=s
responsible to the oversight committees and to the public.

 

For Mueller to make up one problem in this caseCI don=t
have the facts on Bowman and why he was promoted.

 

O=REILLY:   ACbut it=sCthe
facts are right there, Mr. Baker.

 

How about you, Mr. Aldrich? That disturb you?

 

ALDRICH:   Actually, no, and as a matter of fact, I have
to side with the director=s
office on this one in not letting Agent Wright testify . . . 

O=REILLY:   No, no, no, no.  I=m talking about the Zacarias
Moussaoui thing.  I=m
talking about giving the guy, Bowman, who wouldn=t OK
Rowley=s
request for a wiretap on Moussaoui=s computer before 9/11 a
commendation and then giving Rowley a hard time for complaining about it.

 

ALDRICH:   Well, as far as I know, Rowley never received
any reprimand in her file or a letter of commendation or a letter of . . . 

 

O=REILLY:
  Nothing.

 

ALDRICH:   . . . or any of the things . . .

 

O=REILLY:   Nothing. 
But Bowman got commended, and he=s the guy that screwed the
case up.

 

ALDRICH:   WellCwell, we don=t
know that he=s the
only person who screwed this case up.  I
think there are others involved in this. 
I=m
not . . . 

 

O=REILLY:   All right. 
All right.

 

ALDRICH:   I=m not defending the . . . 

 








O=REILLY:   Yes, you are. 
You both are.

 

ALDRICH:   I=m just trying to be fair.

 

O=REILLY:   I mean, if this is what we=ve
gotCif
this is what=s
protecting us, a Mueller and an FBI who gives a guy a commendation who won=t tap
Zacharias Moussaoui=s
computer, and . . .

 

BAKER:      Bill . . .

 

O=REILLY:   I don=t know what to say. 

 

Go ahead, Mr. Baker, I=ll give you the last word.

 

BAKER:      Well, I worked very closely with Bob
Mueller during the previous Gulf War, and we worked hand in glove.  We prevented terrorist acts.  He=s a solid, proven leader.  He rearranged the San Francisco U.S. Attorney=s
office.  

 

He=s a
career prosecutor, who, after he was turned out when President Clinton took
officeCand,
Gary, you know these detailsCafterwards, Mueller didn=t run
to a large law firm to make triple figures. 
He elected to go back and prosecute homicides in the district.

 

O=REILLY:   All right.

 

BAKER:      ThisCthis is a proven
professional, Bill. I . . .

 

O=REILLY:   And I respect yourCI=mCI
could be wrong, Mr. Baker.  I respect
your opinion, OK?  I just want an answer.

 

And I=m
going to tell everybody watching tonightCwe=ve
got millions of people watchingCif you want an answer about
this wiretap, as I think we all do, Mr. Baker, Mr. Aldrich, and me, we have a
link on billoreilly.com where you can get right into the White House and just
say we=d
like an answer on this question.

 

BAKER:      That=s fair.








O=REILLY:   Thank you very much.  We appreciate both your points of view.

 

Next up, an update on Amiri Baraka. 
Will the State of New Jersey finally get rid of this embarrassing poet
laureate in a moment?

 

The transition blurb was AWhy the Delay?@ with regard
to removal of Baraka.  O=Reilly then interviewed a New Jersey Assemblyman on Baraka=s 9/11 accusations.  The Most
Ridiculous Item of the Day was the fact that a translator doing a voice over
had used a fake accent[11].  Viewer e-mail included a response to the FBI
story, to which O=Reilly
retorted that the issue was that Appellee Aallegedly wouldn=t
investigate terrorism,@ and O=Reilly told viewers that if they wanted an answer to whether Appellee
would not wear a wire, to visit the billoreilly.com website for a link to the
White House.

THE O=REILLY FACTOR, March 6,
2003








In the Introduction, O=Reilly announced that there would be no Talking Points memo.  The remainder of the Introduction segment
addressed more controversy over the Muslim FBI agent Awho apparently refused to wiretap a Muslim terror suspect.@  The first four interviews took
approximately thirty minutes, in which O=Reilly asked his guests why Europeans hate Americans and why other
countries did not see the terrorism threat that the U.S. sees.  In the first transition blurb, O=Reilly asked whether the FBI was covering up anything, and in the
second, he stated, AMore
disturbing charges about Muslim FBI Agent . . . .@

During the Factor Follow‑Up,
O=Reilly showed the FBI seal, followed by Mueller=s photograph and a video clip of Sami Al‑Arian being
arrested.  The Factor Follow-Up went as
follows:

O=REILLY:   Thanks for staying with us.  I=m Bill O=Reilly.  In THE FACTOR follow‑up segment
tonight, we are still trying to get the FBI to answer a very simple
question.  Did Agent Gamal Abdel Hafiz
(ph) refuse to tape fellow Muslims, including Sami al Arian (ph), who were
being investigated for terrorist-related activities?

 

So far, the Bureau has not clarified the situation, and we=ve
called for Director Robert Mueller to do so. 
Mr. Mueller did, however, threaten to discipline FBI Agent Robert Wright
if he came on THE FACTOR and testified about the incident in front of you.  Agent Wright was deeply involved in the case.

 

But tonight, joining us from Chicago, is retired FBI Agent John
Vincent, who was also an eyewitness to what happened.  He is joined by attorney David Schippers, who
is representing both Agent Vincent and Agent Wright.

 

All right, Agent Vincent, what did you see?  What happened?

 

VINCENT:   I was part of a conference telephone call
between Chicago and Dallas.  In
attendance at this conference call w[ere] three U.S. attorneys, two agents,
myself and agent Robert Wright.  Also
party to this conversation, of course, [wa]s Gamal Abdel Hafiz (ph) and his
supervisor in Dallas. 

 








At that conference call, U.S. Attorney Mark Flessner asked Agent Gamal
(ph) if he would use a wire to record the conversation that potentially was
going to take place.  At that time, Gamal
(ph) refused.  U.S. Attorney Mark
Flessner pressed him and asked him why he wouldn=t.  And Gamal (ph) said, you wouldn=t
understand, it=s a
cultural thing. 

 

At that time, Flessner pushed further, and finally Gamal (ph) said a
Muslim does not record another Muslim.

 

O=REILLY:   He said that on the phone.  You heard him say that?

 

VINCENT:   Yes he did. 
He said it on the phone.

 

O=REILLY:   And you wanted him to record a Saudi who was
under suspicion of financing Osama bin Laden, correct?

 

VINCENT:   Well, indirectly, yes.  Actually, it was an official in an East Coast
company that was under investigation by Robert Wright=s
case.

 

O=REILLY:   But it was a Muslim individual?

 

VINCENT:   Yes, it was a Muslim individual. 

 

O=REILLY:   All right. 
So when Hafiz (ph) says on the phone, and six guys heard it, a Muslim
doesn=t
tape another Muslim, what was the reaction? 
What was the conversation then after that?

 

VINCENT:   Well, there wasn=t any
conversation for a while.  Everybody was
stunned. Bob Wright and I looked at each other. We kind of knew what was
coming.

 

U.S. Attorney Flessner said, AWhat is the problem?@  And Gamal (ph) said, AI
fear for my life.@  And at that time, Flessner said, AWell
aren=t you
sure that the FBI is going to protect you?@  And Gamal (ph) said, ANo,
the FBI can=t
protect me.@  He said, AThe FBI, I don=t
trust them.@

 

O=REILLY:   Wow. 
Now why would the man fear for his life? 
Was the guy you were investigating that powerful?

 








VINCENT:   Not at all. 
It had to do with the Muslim community there in Dallas.  Gamal (ph) felt that since he was so well
known and that if it ever came out that he had done this that there would be
some threats to his life.

 

O=REILLY:   OK. 
This was before 9/11, correct?

 

VINCENT:   It was before 9/11.

 

O=REILLY:   Did the case just die then or did you guys
take it upstairs?  Did the Dallas bureau
chief for the FBI do anything?

 

VINCENT:   Bob immediatelyCBob
Wright immediately called headquarters and complained about it then.  Later on, I went to our office security
manager, and I asked that person to call headquarters (UNINTELLIGIBLE) what had
to be done to file a dereliction of duty complaint against another agent.  That security officer did, on at least two
separate occasions, call FBI headquarters and never received a response.

 

O=REILLY:   OK. Now how important was the guy that you
wanted him to wear the wire on, and was it an undercover wire?

 

VINCENT:   No, it wasn=t.
When this whole program came out, the bureau came back and stated that we
wanted him to record this conversation in a mosque.  That never happened.  Then after they decided that that wouldn=t
work, then they said that they didn=t want him to record the
conversation because he was represented by an attorney, but that doesn=t
apply either.

 

O=REILLY:   But how important was the guy you were trying
to get?

 

VINCENT:   Well, we don=t
really know.  We never did talk to the
man.

 

O=REILLY:   But what did you think he was doing?  What were you investigating him about?

 

VINCENT:   Well, he was part of a money-raising scheme
that was funneling money over to the Middle East.

 








O=REILLY:   Was it al Qaeda?  Was itCbecause we heard it was Osama
bin Laden=s
outfit.

 

VINCENT:   Well, this is Yassin Kadi (ph).  He was involved in organizing or paying for
this particular company that he was working forCthis
fellow was working for.

 

O=REILLY:   All right. 
So there was an al Qaeda or possible al Qaeda connection there?

 

VINCENT:   Yes. 
This individual was also involved in the Boston (UNINTELLIGIBLE) fiasco.

 

O=REILLY:   I go[t] it. 
Now, Mr. Schippers, the FBI has recalled the Agent Hafiz (ph) from Saudi
Arabia, where he was sent after this incident, and he is now, I understand,
under investigation by the Justice Department=s
internal affairs division.  What is going
on here?  Do you know?

 

SCHIPPERS: I=ll tell you, I will never be
able to figure this one out, Bill.  I
cannot 

understand why the FBI is putting their integrity in question over a
totally indefensible action by one of their agents.  There is nobody who can tell me that if an
FBI agent can refuse to wear a wire when someone reaches out to talk to him.

 

It was the same with Sami al Arian (ph).  That wasn=t even wearing a wire.  Arian (ph) called him and asked to talk to
him.  All he had to do was put an
overhear device on his telephone and nobody in the world would have known that
he was . . .

 

O=REILLY:   This is Hafiz (ph) who refused to
record Sami Al‑Arian (ph). [Part of Statement Nine] So that=s
what the Tampa people say. 

 

SCHIPPERS: I=ll tell you, Bill, I=m
getting sick to deathCBob
Wright has now  

been totally gagged by the FBI. 
They go out and they call him a liar. 
They make statements about him. 
They tell people that he doesn=t know what he=s
talking about.  And then when he tries to
defend himself, they say, sorry, pal, you can=t
talk.  That=s why
. . . .








O=REILLY:   Well, they=re definitely trying to get
Wright.  I mean he was, as you know, an
hour away from appearing with us and they gagged him.  And said if you do, we will charge you with
insubordination.

 

But I don=t
understand whatCMueller
is embarrassed now.  This is out,
OK?  And there=s
still something floating around for the Justice Department to be investigating
this Hafiz (ph).  Mueller said it=s not
on the same case.  Do you have any clue
what is going on?

 

SCHIPPERS:
Bill, it=s
probablyCyou
know it=s
what I call the Clinton mode.  It=s 

not on the same case.  That=s
right, it=s not
on al Arian (ph) and maybe it=s not on the Kadi (ph) case
in 1999.  But they are investigating him.

 

And what is so secret?  What are
they hiding?  Something is being hidden
here, and there=s a
reason that they=re
hiding it.  And I will go to my grave
trying to understand it.  Aren=t
they interested in finding the truth?

 

O=REILLY:   Listen, we know the truth.  The truth is I believe your two agents here,
the guy wouldn=t tape other Muslims.  That=s the
truth.  And he wasn=t
disciplined. [Part of Statement Nine]

 

SCHIPPERS:
I wonder why.

 

O=REILLY:   I don=t know that.  But he should have been disciplined, and he
wasn=t.
[Part of Statement Nine] And now Mueller is trying to keep us from finding out
what the big picture is.  But we=re
going to find it.  Believe me, we will
find it.

 

Gentlemen, thanks very much.  We
appreciate it.

 

When we come back, AThe New York Times@ is
going to run a piece that may hurt actor Mel Gibson.  We will analyze it up next.

 








The Back of the Book segment
was about an interview to be published in the New York Times with Mel
Gibson=s father.  The Most Ridiculous
Item of the Day was O=Reilly=s ranking in the AMost Popular TV People@ survey.  The viewer emails
included response to the Pope article, comments on the peace shirt and Hillary
Clinton pieces, and statements about war.

Appellee=s Actual Malice Contentions








Appellant contended in its
summary judgment motion that there was no evidence of actual malice and states
on appeal that Appellee cited no evidence with regard to O=Reilly=s state of
mind when the challenged statements were published, and, particularly, that
there is no evidence that O=Reilly knew any of the challenged statements were false when FOX
broadcast them.  Appellee contends that
there is a genuine issue of material fact with regard to whether Appellant made
each contested statement with knowledge of its falsity or reckless disregard to
its truth.  The record pertaining to
Appellants= state of
mind consists of O=Reilly=s deposition, Kristin Lazure=s affidavit, deposition, and production notes (Anotes@)[12]
prepared for the March 4, 5, and 6 broadcasts, and David Brown=s affidavit and deposition.[13]  Brown and Lazure were producers on THE O=REILLY FACTOR in 2003; Lazure
performed the research for the Broadcasts.

Appellee made the following
specific contentions with regard to actual malice: (1) that Appellant
purposefully avoided the truth; (2) that Appellant knew the statements were
false or acted with reckless disregard to their truth or falsity; and (3) that
Appellant selected its material with actual malice and made deliberate
omissions.

Purposeful Avoidance

Appellee asserted that at the
time the contested statements were made, Appellant Apurposely avoided the truth by not consulting sources that could have
objectively verified that [Appellee] never refused an order to wear a wire@ and by not checking the accuracy of the Broadcasts with the FBI,
available public records, or Awith independent reliable and verifiable sources@ prior to publication.













Evidence showing that a
defendant purposefully avoided the truth would be enough to suggest that he
doubted a story=s accuracy
and would thereby constitute some evidence of actual malice.  Harte‑Hanks, 491 U.S. at 689,
692, 109 S. Ct. at 2696, 2698.  In Harte‑Hanks,
the U.S. Supreme Court stated that a newspaper=s failure to consult other sources that could have objectively
verified a story brought by a single, unreliable source was evidence that the
newspaper purposefully avoided learning facts that would have shown the story
to be false and supported a finding of actual malice.  Id. at 692, 109 S. Ct. at 2698; cf.
Skeen, 159 S.W.3d at 638 (stating that purposeful avoidance theory was not
supported when defendants conducted five months of research involving
interviews with parties on both sides of the issue, including the defamation
plaintiffs, reviewed the court records of the cases discussed in the article,
and there were no existing sources to easily disprove the criticisms in the
article); Huckabee, 19 S.W.3d at 427‑28 (stating that where film
makers interviewed several people on both sides of the story, performed
extensive research, and no source could have easily proved or disproved the
film=s allegations, finding of purposeful avoidance was precluded).  However, the mere failure to investigate or
to act reasonably before publishing a statement is distinct from actual malice,
because Areckless conduct is not measured by whether a reasonably prudent man
would have published, or would have investigated before publishing.@  St. Amant, 390 U.S. at
731, 88 S. Ct. at 1325; see also New York Times, 376 U.S. at 287, 84 S.
Ct. at 730 (stating that with respect to the newspaper=s failure to check advertisement=s factual accuracy, the record showed that it relied upon its
knowledge of the good reputation of many of those whose names were listed as
the advertisement=s sponsors
and upon the letter from the advertisement=s sender, known to it as a responsible individual and certifying that
the use of the names was authorized). 

To support his purposeful
avoidance contention, Appellee presented evidence that Appellant never
contacted Gossfeld, who had been the Supervisory Senior Resident Agent in the
Chicago FBI office.[14]  Gossfeld testified that neither ABC, nor FOX,
nor any other media attempted to contact his office and speak with him at any
time with regard to Wright and Vincent=s allegations.  Appellee also
claims that Appellant failed to check the accuracy of the Broadcasts with the
FBI or available public records.








O=Reilly testified that he has been an anchor at FOX News for
nine-and-a-half years, has master=s degrees in broadcast journalism and public administration, and began
his career in the news business in 1976. 
He testified that Lazure had been the story coordinator responsible for
gathering the information and that he did not remember Aany of the minutia of how the story developed.  I can only tell you that the story piqued my
interest, I assigned it, it came back with three primary sources, once you have
three primary sources on a story you go with it.@[15]  He listed the three primary
sources as Flessner, Vincent, and Wright. 
He also testified that Lazure had been instructed to call Appellee,
although he did not know whether she called him, and that his orders to his
staff were to Aget
[Appellee=s] point of
view, get him on the program.@

 Brown testified that he has a bachelor of arts
degree in film and has been with FOX for ten years in various capacities.  He described the research procedure,

You=d
look for stories, get them approved, find the appropriate guest, do a pre‑interview,
get pertinent background information, factual information.  Prepare a packet of information for Bill O=Reilly
and for the producer to go through.  Find
supporting tape, video, 

B‑roll.  Put together the complete package, have it
wrapped up, neat in a bow for him to go on air that evening. 








 

He testified that part of Lazure=s job was to accurately get guests= points of view.  With regard to
accuracy, Brown testified that it was A[b]etter to be accurate than first,@ and that accuracy was paramount in reporting, so much so that Ayou get it right or you just don=t do it at all.@

Lazure testified that she has
a degree in journalism from Vanderbilt University.  In her affidavit, she stated:

I performed research for the
March 4, 5, and 6, 2003 programs which are the subject of this suit. . . . I
believe that all of the statements in those broadcasts were either literally or
substantially true at the time of the broadcasts.  I did not then and do not now entertain any
doubt, serious or otherwise, about the truth of the statements in the March 4,
5, and 6, 2003 broadcasts.








She testified that she prepared the information
packets that O=Reilly used
to prepare for the Broadcasts, describing the process as taking information
from other reports and putting it at the top of the packet with attribution to
the source material, then information about the guests, information about what
the guests told her, and then information she received after speaking to an FBI
representative.[16]  Lazure=s notes from March 4, 5, and 6, 2003 contain the following
information: the subject, in capital letters, followed by background
information on the subject, then information on each guest, the guest=s point of view, and other related facts and statistics.

Lazure testified that she
invited someone from the FBI to come on the show and that Ait [was] standard protocol to always invite them.@  Her notes reflect that she did
contact the FBI but that she did not receive an official statement.  The unofficial FBI statement covering March 4
and 5 merely indicates that the FBI agent with whom Lazure spoke informed her
that he had Apersonally .
. . never been able to substantiate@ the claim that Appellee refused to wear a wire, that Appellee denied
it, and that the suggestion that Appellee refused to wear a wire was Aridiculous.@  The unofficial statement in Lazure=s March 6 notes states that the FBI=s position Ais that one
agent alone doesn=t decide
whether or not to wear a wire@ and that the FBI agent with whom Lazure spoke could only speculate
why the other FBI agents and U.S. attorneys claimed they witnessed Appellee
state that A[a] Muslim
does not record another Muslim.@








O=Reilly testified that he did not receive an official statement from
the FBI about the issue, that he had no documentation from the FBI, that the
FBI would not appear on camera, that the FBI did not give clarification to
Lazure in an official capacity, and that was all that they would use.  He stated that because the information
received by Lazure from the FBI was not an Aofficial statement,@ that is, either on camera or on FBI stationery, it was Abackground@ and Ahearsay,@ and they
did not use it because Awe do not
use hearsay or he said she said.@  O=Reilly testified that, with regard to Ed Cogswell and John Ianarelli,
two FBI representatives with whom Lazure had contact, Athey were not in on the investigation as the other three individuals
that we put on, two on camera and one for background, were.@  Cogswell=s and Ianarelli=s comments
were in Lazure=s March 6
notes.

Appellant attached Wright=s sworn EEOC statement to its summary judgment motion, giving his
version of the 1999 incident, including Appellee=s statement during the conference call that he would only record the
individual if he told him he was wearing a wire, that he feared for his safety
and did not trust the FBI to protect him, and that A[a] Muslim does not record another Muslim.@  Lazure=s notes indicate that Appellant was aware of the EEOC filing, and
Wright=s EEOC statement is listed as a source in the Wall Street Journal article
that O=Reilly testified triggered his interest in the story.[17]








O=Reilly testified that he was not aware of any credibility issues with
regard to Wright prior to the broadcast. 
Lazure=s notes for
all three Broadcasts state that Wright was Aa controversial agent (represented by both Judicial Watch and House
impeachment counsel David Schippers) who has gone public several times in the
last year with charges that the FBI has thwarted his counterterrorism
investigations,@ but there
is nothing in her notes to indicate that Wright was not credible.  O=Reilly testified that he had always found Schippers Aa very credible guest for us@ and that Schippers had Aalways been accurate.@  See New York Times, 376
U.S. at 287, 84 S. Ct. at 730 (stating that showing that the newspaper relied
upon its knowledge of the good repute of the listed sponsors and sender did not
support actual malice claim). 








Although Appellant did not
contact Gossfeld, it did consult more than one source in preparation for its
story, per its described research protocol of obtaining three primary sources,
and there is no evidence, based upon the sworn statements of the individuals
Appellant did contact and its position on Aunofficial statements,@ that Appellant knew that its sources were unreliable or had serious
doubts about their reliability.  Cf.
Harte‑Hanks, 491 U.S. at 692, 109 S. Ct. at 2698.  Because the record indicates that Lazure did
check with the FBI, albeit unofficially, and that neither O=Reilly nor Lazure doubted the credibility of the statements made by
their three primary sources at the time that the Broadcasts were made, there is
no evidence that Appellant purposefully avoided the truth, and, therefore,
Appellee=s actual malice argument on this point fails.  Cf. id. (holding that reliance on
single, unreliable source supported finding of purposeful avoidance).

Statements

Appellee claimed that the
challenged statements were made with actual malice.  Appellee=s issues with regard to the challenged statements pertain to: (1)
refusal to obey orders; (2) Yassin Kadi; (3) Sami Al-Arian; and (4) O=Reilly=s assertion
of Athe truth.@  We will also address the remaining portions
of the challenged statements within this section.

(1) Refusal To Obey Orders








Appellee=s general contention is that he was not ordered, and so did not
refuse, to secretly record other Muslims. 
He asserts that Appellant knew that Appellee had expressed procedural
misgivings with regard to wearing a concealed recording device, that he never refused
any order to wear one or to record telephone conversations, and that he never Acited any religious reasons for not wanting to surreptitiously record
other Muslims.@  He also claims that Appellant knew that he
was expressly ordered not to wear a wire by his Dallas FBI superiors and
that, although Appellant knew all of this information at the time of the
Broadcasts, Athey
disregarded it, at the expense of the veracity of the information they
conveyed.@  In his response to Appellant=s summary judgment motion, Appellee contended that Appellant stated
that he refused Ato obey
orders to surreptitiously record fellow Muslims with respect to ongoing
terrorism investigations@ and that
the refusal-to-wear-a-wire statements were made with actual malice because
Appellant was Aaware that
the FBI had a hierarchy in how it conducted investigations.@

Refusal Statements

During the three Broadcasts,
O=Reilly indicated that, with regard to FBI terrorism investigations,
there were charges that Appellee Arefused to wear a recording device@ [Part of Statement Three], that there were eyewitnesses who said
Appellee Arefused to
wear a wire@ [Part of
Statement Eleven], that Wright and Flessner said Appellee Adeclined to secretly tape . . .@ [Part of Statement Four], and that another agent had accused Appellee
Aof refusing to record other Muslims who the FBI was investigating@ [Part of Statement Six].[18]








O=Reilly made the statement, AThe Tampa office in the Al-Arian case asked [Appellee] to wear a
wire.  He declined.@ [Part of Statement Twelve].  He
reiterated, AThis is
[Appellee] who refused to record Sami Al-Arian (ph).  So that=s what the Tampa people say,@ [Part of Statement Nine] and, at the conclusion of the third
broadcast, stated, AThe truth
is, I believe your two agents here, the guy wouldn=t tape other Muslims.  That=s the truth.  And he wasn=t disciplined@ [Part of
Statement Nine] and opined that Appellee should have been disciplined.

Procedural Misgivings








O=Reilly=s deposition
and Lazure=s affidavit,
deposition, and notes reveal nothing about any pre-Broadcast knowledge of
Appellee=s asserted procedural misgivings.[19]  In the March 6 broadcast, Vincent indicated
that one of Appellee=s stated
reasons for refusing was that he was afraid that threats would be made on his
life if he did it and that the FBI could not protect him. There is no evidence
in the record to show that O=Reilly was aware of this misgiving, or any other, prior to the
Broadcasts.

FBI Decision-Making Hierarchy And Orders

Appellee claims that O=Reilly understood that the FBI worked within a hierarchy.  As evidence that O=Reilly=s statements
that Appellee had refused to wear a recording device were made with actual
malice, Appellee cites O=Reilly=s statement in the March 4 broadcast that Wright was prohibited by his
FBI superiors from appearing.  He also
asserts that Appellant was aware of FBI hierarchy because Appellant was in
possession of the FBI=s press
statement indicating that the decision regarding the investigation was made by
management in the Dallas FBI office.








Lazure=s notes for all three Broadcasts reference the ABCNEWS Primetime
report from December 2002 as reporting that Appellee, a Muslim, Ahad twice refused requests by other FBI agents to secretly
record conversations with Muslims suspected of supporting terrorism activities.@  [Emphasis added.]  Lazure=s headline in the March 4 notes is, AMUSLIM FBI AGENT REFUSED TO WEAR WIRE WITH AL-ARIAN,@ and we infer that this was the basis for O=Reilly=s statements
in the Introduction and transition blurbs of the March 4 broadcast.  Lazure swore in her affidavit that she
believed all of the statements in the Broadcasts were either literally or
substantially true at the time of the Broadcasts and that she did not entertain
any doubt about their truth.








Lazure=s notes for all three Broadcasts include Wright=s claims that Appellee refused to wear a wire and to secretly record a
conversation with Al-Arian in 1998 and one of Kadi=s suspected associates in 1999, both Muslims, and that Appellee made
the statement, AA Muslim
does not record another Muslim.@  All of the notes include the
unofficial FBI statement that Appellee Avehemently denies that he refused to wear the wire@ and proclaims, Aany
suggestion that [Appellee] refused to wear [the wire] is ridiculous.  Our agency does not work that way.@  However, the unofficial
statement does not make clear how the agency does work, other than
alluding to Alayers of
management that make a decision on whether or not someone will wear a concealed
wire.@[20] Lazure=s notes on
Baker=s point of view for the March 5 broadcast indicated that Baker thought
that, based on what his sources had told him, it Awill come out that management made the call for him not to wear the
wire.@  The unofficial FBI statement
from Ianarelli in the March 6 notes states that Athe Muslim agent didn=t make the call not to wear a wire, his superiors did.@ Cogswell=s unofficial
FBI statement in the March 6 notes state that it was a managerial decision made
by the special agents in charge Ain the Dallas and Chicago offices.@  [Emphasis added.]  O=Reilly testified that he considered the unofficial FBI statements
background material.

Per the reference in Lazure=s March 6 notes, it would appear that O=Reilly or his staff was aware of the FBI=s official statement to ABC in December 2002, which made reference to Athe alleged refusal to wear a recording device@ and that the agent in charge had indicated that Ahad the consensual monitoring been requested for any location other
than a mosque, [Appellee] would have supported the proposal.@  [Emphasis added.]  The official FBI statement indicates that A[u]ltimately, the decision was made by management of the Dallas
office,@ which Aconcurred
with [Appellee=s] request
not to conduct the consensual monitoring.@  [Emphasis added.]








In none of the Broadcasts did
O=Reilly directly state that Appellee had received an order and
refused to follow it.[21]  There is no evidence that, as of the March 4
broadcast, O=Reilly had
an understanding that there was a distinction in the FBI between a Arequest@ and an Aorder,@ or who
would have the authority to make a request or to issue an order, assuming that
O=Reilly read the unofficial FBI statement about layers of management.[22]  During the March 4 broadcast, when Flessner
started describing the discussion process between the Chicago and Dallas FBI
offices and the Chicago federal prosecutors, O=Reilly cut him off with, ABottom line, though?@  O=Reilly testified that he was not aware of FBI regulations about field
agents making statements to the media, and his three days of expressing outrage
that Wright was prevented from appearing on his show support this testimony.[23]








During the March 5 broadcast,
O=Reilly acknowledged to Baker, A[M]aybe they didn=t give [Appellee] a direct order,@ but it is unclear whether Athey@ referred to
Wright, Flessner, the Tampa office, or Athe bureaucracy@ generally.
[Emphasis added.]  Appellee points to
Baker=s statements informing O=Reilly in the March 5 broadcast that it was not the agent=s decision to wear or not wear a recording device, arguing that A[d]espite this information, in the March 6, 2003 broadcast,@ O=Reilly Ais back to stating that [Appellee] refused to wear a recording device@ and Agoes so far
as to state that [Appellee] would not tape other Muslims, and >that=s the truth.=@








During the March 5 broadcast,
Baker said to O=Reilly, Athe decision to wear a wire is not made by a field agent in a case. .
. [;] the decision by regulation is to be made by the special agent in charge,@ and told O=Reilly that
in this case, that would have been the special agent in charge in Dallas.  O=Reilly countered, AHow do you know that, because we=re being told by [Flessner] and Agent Wright that everybody
wanted this to happen.@  [Emphasis added.]  Baker responded, AI=m told otherwise,@ and informed O=Reilly that
once all the facts were laid out, it would be Appellee=s supervisor in the field who made the decision.  O=Reilly responded with Statement Seven, about the FBI agents disputing
Baker=s statement and turned to Aldrich for his comments. During Aldrich=s interview, O=Reilly
admitted, AMr. Baker
might be right.  Maybe [he] didn=t . . . receive a direct order. 
I wasn=t there.@  There was no evidence  based on the March 4 and 5 interviews or
notes to indicate that O=Reilly knew
that the refusal allegations were false or that he was convinced by Baker
sufficiently to have serious doubts about the truth of the statements he later
made.








During the March 6 broadcast,
O=Reilly stated that he was still trying to get the FBI to answer the
question, ADid
[Appellee] refuse to tape fellow Muslims . . . who were being investigated for
terrorist-related activities?@ During the interview, Vincent said that Appellee refused and said
that Aa Muslim does not record another Muslim.@  During his interview with
Schippers about the Al-Arian incident, O=Reilly rephrased Schippers= statement as, AThis is
[Appellee] who refused to record Sami Al-Arian,@ and added, ASo that=s what the Tampa people say.@[24]  At the end of the interview,
in response to Schippers= question
about the FBI, Aaren=t they interested in finding the truth?@  O=Reilly replied, AListen, we
know the truth.  The truth is, I believe
your two agents here, the guy wouldn=t tape other Muslims.  That=s the truth.  And he wasn=t disciplined.@[25]  In Statement Nine, O=Reilly merely summarized what his guests told him on March 4 and March
6 about Appellee not taping other Muslims.

During the March 4 broadcast,
O=Reilly asserted, with regard to Wright, AFBI chief Robert Mueller threatened to fire him if he appeared on THE
FACTOR.@  During the Flessner interview,
O=Reilly, leading into another question, stated 

the
FBI, according to your testimony and Wright=s testimony, is covering [the
wire issue] up because this is an embarrassment to them.  And Mueller, again, we don=t
trust him.  Flat out don=t
trust him. . . . Wright was told that they would fire him if he came on
THE FACTOR, but they can=t fire him now, right?
[Emphasis added.] 

 

He also made the assertion, A[Mueller] said flat out to Wright one hour ago, you go on THE O=REILLY FACTOR, you=re toast.@








During the March 5 broadcast,
O=Reilly stated, AWright is
writing a book, but was told he would be charged with insubordination if he
appeared on THE FACTOR last night,@ and Awe were
going to have Wright on last night, and they threatened to fire him for
insubordination if he came on and told his story.@ [Emphasis added.]  During the
March 6 broadcast, O=Reilly
stated, AMr. Mueller did . . . threaten to discipline FBI Agent Robert Wright
if he came on THE FACTOR and testified about the incident in front of you.@  Schippers, Wright=s attorney, stated, ABob Wright has now been totally gagged by the FBI.  They go out and they call him a
liar. . . .@  [Emphasis added.]  O=Reilly responded with, A[T]hey=re definitely trying to get Wright. . . he was an hour away from
appearing with us and they gagged him. 
And said if you do, we will charge you with insubordination.@  [Emphasis added.]  Other than Mueller, the nebulous Athey@ is never
identified.  Even indulging every
reasonable inference in Appellee=s favor, a plain reading of O=Reilly=s comments
about Mueller, Wright, and the FBI tends to indicate more that O=Reilly had no idea about how the FBI hierarchy worked, rather than
such a clear picture of how decisions were made within the agency that his
statements would indicate any knowledge of falsity, or serious doubts with
regard to the truth, of the refusal statements.

Order Not To Wear A Wire And Religious
Reasons








There is also no evidence
that Appellant knew that Appellee Awas expressly ordered not to wear a wire@ at the time of the Broadcasts. 
The unofficial statement in Lazure=s notes does not indicate that the Dallas FBI office ordered Appellee
not to wear the wire, and nothing else in the record from the time of
publication indicates that Appellant was aware of any express orders to
Appellee to not wear a wire.  See
Skeen, 159 S.W.3d at 637.     With
regard to Appellee=s assertion
that Appellant knew that he had never cited any religious reasons for not
wanting to surreptitiously record other Muslims, no evidence in the record
supports it.  There is, however,
considerable evidence to the contrary in the form of the statements captured in
Lazure=s notes and from O=Reilly=s guests,
Flessner and Vincent.  Flessner said in
the March 4 interview that he heard Appellee say, AI do not record another Muslim. 
That is against my religion.@  Vincent said in the March 6
interview, A[Appellee]
said a Muslim does not record another Muslim.@  Lazure=s March 4 notes contained Wright=s statement that Appellee said, AA Muslim does not record another Muslim.@  O=Reilly repeated this statement on March 5 as AWright says Hafiz told people, quote, >A Muslim does not record another Muslim.=@[26] No evidence in the record shows that O=Reilly believed these statements to be false or that he had serious
doubts about their truth.








Because a defendant has to
have either known his statements were false or entertained serious doubts as to
their truth at the time of publication, and nothing here showed that O=Reilly either had such doubts or that he knew anything about Appellee=s procedural misgivings, orders, or the FBI hierarchy outside of the
allegations attributed to Wright, Vincent, and Flessner in Lazure=s notes or made by his various guests during the interviews, there was
no evidence of actual malice as to these issues.  See Skeen, 159 S.W.3d at 637. 

Therefore, with regard to the
portions of Statements Three, Four, Six, Nine, Eleven, and Twelve, and Statements
One and Two subsumed within Statements Nine and Twelve, that pertain to
Appellee=s alleged refusal to record other Muslims, we conclude that Appellee
has not demonstrated a genuine issue of material fact with regard to actual
malice.

(2) Yassin Kadi Statements








O=Reilly made three statements that included a reference to Kadi:
Statements Three, Four, and Six.[27]  Statement Three was made during the March 4
broadcast and Statements Four and Six were made during the March 5
broadcast.  Appellee contends that O=Reilly falsely reported that Kadi was the target of the proposed
surveillance, even though FOX=s own pre‑broadcast memos indicated otherwise, and that this
constitutes objective evidence that raises a genuine issue of material fact as
to whether O=Reilly and
FOX entertained serious doubts as to the truth of the Broadcasts.  Appellee complains that Appellant was told
that the person to be recorded was not Kadi and that the investigation was
related to the 1998 African Embassy bombings but that Appellant still Areported that the person to be recorded was Mr. Kadi and implied that
the investigation somehow related to >9/11=.@  He states that with regard to
Kadi, O=Reilly made his assertions Adespite the fact that [Appellant] and that part of the program
information packets prepared by his own producer flatly stated that the person
[Appellee] was asked to record by the Chicago FBI office was not Mr. Kadi, but
was an unnamed associate of Mr. Kadi.@








Appellant responds that there
is no evidence that O=Reilly knew
the statements about Kadi were materially false when he broadcast them and that
there is no evidence that O=Reilly actually saw any pre‑broadcast memo with regard to the
proposed surveillance target, only Brown=s speculation that O=Reilly Awould have
seen@ the memo and Lazure=s testimony that she did not recall if O=Reilly saw the memo or if she discussed it with him prior to the
broadcast.[28]  O=Reilly identified Lazure=s March 6 notes during his deposition as the information that was
prepared for him, but there is no other testimony by O=Reilly in the record about Lazure=s notes for the three Broadcasts, nor any testimony that he read what
was prepared for him.

March 4 Broadcast 

During the March 4 broadcast,
O=Reilly made Statement Three, AIn the >Impact= segment tonight, very disturbing story.  Charges that an FBI agent named Amal Abdel
Hafiz (ph) refused to wear a recording device in terrorist investigations of
accused money men Yassin Al‑Kadi and Sami Al‑Arian.@ O=Reilly
testified that he writes the introductions to interviews and that on March 4,
the Aintro@ that he
wrote went to where Flessner began speaking. Therefore, the record establishes
that O=Reilly actually wrote Statement Three, rather than the Aunscripted@
conversation he testified occurs Aonce the interview starts.@  The record also tends to
establish that he at least skimmed Lazure=s March 4 notes because his lead‑in for the broadcast and the
facts that he used closely parallel the information in the March 4 notes,
specifically:

(1)
The program=s
initial lead‑in included the header AMuslim Agent Trouble,@ and
O=Reilly
stating there were charges that an FBI agent of Arab descent refused to wear a
wire while investigating Sami Al‑Arian. 
The headline of Lazure=s March 4 notes was AMuslim
FBI Agent refused to wear wire with Al‑Arian.@

 

(2) O=Reilly stated that Kadi was being investigated for activities
surrounding the bombing of an American embassy in Africa; Lazure=s notes state, A[M]oney for
the 1998 African embassy bombings led back to Kadi.@ 








(3) O=Reilly
stated that Kadi lives in Saudi Arabia; Lazure=s
notes state, AKadi
is a powerful Saudi Arabian businessman.@ 

 

(4) O=Reilly stated that Al‑Arian had been charged with raising money
for Palestinian Islamic Jihad; Lazure=s notes state that Al‑Arian was indicted two weeks before on
fifty counts by a federal grand jury in Tampa and had been arrested on charges
that he headed the U.S. branch of the Palestinian Islamic Jihad, and money
laundering was among the charges. 

(5) O=Reilly stated, ALast week,
the FBI put Hafiz on leave but denies he refused to wear the wire@; Lazure=s notes
state, ALast week, the FBI placed [Appellee] on administrative leave and
ordered him back to the United States,@ and include the unofficial FBI statement that A[a]ny suggestion that he refused to wear [a wire] is ridiculous.@ 

(6) O=Reilly stated, A[W]e were
supposed to have FBI counter‑terrorism agent Robert Wright, who worked
with Hafiz, as our guest this evening, but FBI chief Robert Mueller threatened
to fire him if he appeared on THE FACTOR. That happened about an hour ago.@  Lazure=s notes state to O=Reilly, AYOU MUST SAY
THAT HE IS NOT APPEARING AS A REPRESENTATIVE OF [THE] FBICTHEY=RE PUTTING A
LOT OF PRESSURE ON HIM NOT TO DO THE SHOW.@ 

(7) O=Reilly
introduced Flessner as a former federal prosecutor Awho
worked with Mr. Wright on the Kadi case.@  Lazure=s notes state that Flessner
was a Afmr
fed prosecutor, who worked w/ Agent Wright on Yassin Kadi case.@

 








When asked, with regard to
Statement Three, whether he had a belief that Appellee had refused to record
Kadi, O=Reilly testified, ANo, it clearly says he's accused in charges.  I don=t have a beliefCI wasn=t there and I clearly stated that I wasn=t there and I didn=t know.@[29]  The introduction O=Reilly wrote for the Impact Segment referred to Aterrorist investigations@ of Kadi, and not a specific investigation of Kadi himself.[30]  Having reviewed the language used in
Statement Three, the March 4 broadcast in its entirety, the depositions of O=Reilly, Brown, and Lazure, Lazure=s affidavit and notes, and O=Reilly=s testimony
that he would not write anything that A[he] would not think is true,@ we conclude that there is no evidence that Appellant made an intentional
or reckless false statement with regard to the Kadi reference in Statement
Three.

March 5 Broadcast








The record clearly reflects
that O=Reilly made a mistake during the March 5 broadcast in reporting that
Appellee refused to record Kadi, in Statements Four and Six.  However, it does not reflect that O=Reilly made these statements knowing they were false or with reckless
disregard to their truth or falsity.

Brown testified that Lazure=s notes were part of what O=Reilly generally used and relied on in making his statements and that
O=Reilly would have seen Lazure=s March 4, 5, and 6 notes. 
However, there is no testimony that O=Reilly actually saw the March 5 notes, and Lazure specifically
testified that she did not remember discussing the March 5 notes with O=Reilly.  And, unlike the March 4
notes, other than the headline, Statement Ten, O=Reilly=s statements
during the broadcast do not parallel Lazure=s March 5 notes.[31]








Lazure=s March 5 notes begin after the subject headline with the same
information as her March 4 notes, presented as a large block of text instead of
the four neat paragraphs of the previous day. 
The pertinent sentence, AIn April 1999, [Appellee] also refused to secretly record a
conversation with one of Yassin Kadi=s suspected associates, who was a Muslim,@ is buried approximately halfway through the block of text.  Its placement in the previous day=s notes is the first sentence of the third paragraph.  The text block concludes with two new
sentences about Wright.  The notes then
describe the two guests, Baker and Aldrich and their points of view, provide
the prior day=s unofficial
FBI statement with the notation that Lazure was still waiting on the FBI=s statement for March 5, and, in addition to the same facts from March
4, a new fact that Mueller was appointed by Bush in July 2001.  Lazure also included new background
information on Kadi:

ABOUT YASSIN KADI (pronounced
kah‑dee)

CSaudi
multimillionaire involved in banking, chemicals, diamonds and real estate who
the FBI has been investigating for years.

CIn
1999, the FBI shut down the investigation against him.

CIn
October 2001, he was designated by the U.S. government as a financial supporter
of UBL

C[H]e
is one of 12 on a secret list of Saudi businessmen who funnel money to UBL

C
[T]he U.S. Treasury Department froze Kadi=s assets, alleging that his
Blessed Relief charity had funneled money to Osama bin LadenChe
has denied any connection with terrorism

CYassin
Kadi has challenged the freezing of his assets in Britain in a British court.  He and four others on the U.S. freeze list
also filed administrative appeals with the Treasury Department

C[H]e
is currently living in Riyadh and Jedda, operating his businesses

C[T]he Justice Department now says it is pursuing possible criminal
charges against KadiCin December,
U.S. customs agents searched a Boston company, which provides computers and
software to the FBI, believed to be secretly operated and controlled by Kadi. 

Lazure also included the
following new facts on the FBI:








CIn
May, the FBI came under intense pressure to explain why its top officials had
apparently stymied efforts by their own agents to investigate a long and clear
pattern of evidence that Islamic extremists were plotting terror attacks on US
soil.  In a letter to FBI director Robert
Mueller, Coleen Rowley, the FBI agent in Minnesota who tipped off her superiors
last August to the activities of Zacarias Moussaoui, the alleged A20th
hijacker@ and
the sole person charged in the 11 September attacks, accused the agency of
operating in Aa
climate of fear which has chilled aggressive . . . law enforcement action.@

 

CJudge
Brinkema August 28, 2002 ordered the FBI to explain why it had not been able to
retrieve any electronic mail messages from a free e‑mail account
Moussaoui claimed to have used.  The FBI
September 4 wrote in a 15‑page affidavit that the contents of Moussaoui=s e‑mail account had been stored on the computers of Microsoft
Corp., the software company that owned the e‑mail service.  Microsoft had told the FBI that it deleted
the e‑mail messages of inactive accounts after 30 days, and the entire
account after 90 days.  Since the FBI had
not learned of the account until Moussaoui told them about it in June, 10
months after his incarceration, and because Moussaoui had apparently not
downloaded any of his messages, the FBI had found no trace of the account, the
affidavit explained.








When comparing Lazure=s March 5 notes with O=Reilly=s discussion
of Moussaoui in the Talking Points segment and in his interviews with Baker and
Aldrich, it becomes apparent that in preparing for the show O=Reilly either reviewed some other information not included in the
record or he was already somewhat familiar with the non-Kadi topics
discussed.  Further, it appears that O=Reilly either did not review Lazure=s March 5 notes or did not review them in their entirety, because
there are specific details he discusses which are not present in Lazure=s March 5 notes and specific details within Lazure=s March 5 notes that he fails to mention.[32]  O=Reilly did not testify at all with regard to whether he read Lazure=s March 5 notes.  He did testify
that after he made the decision to investigate the story, he gave the
assignment to Brown, and Brown gave it to Lazure, and Awe started to compile
information.@  [Emphasis added.]  He also testified, speaking generally, that Awe investigated [the story].@  [Emphasis added.]  There is no evidence in the record from O=Reilly about what he did or did not review to prepare for the March 5
broadcast.  He did testify that he was
familiar with Kadi from other press accounts prior to the March 4 broadcast.








With regard to Statement
Four, O=Reilly attributes the statement to Wright and Flessner but testified
that he never spoke with Wright and that he did not recall Flessner=s exact words when asked whether Flessner told him that Appellee
declined to secretly tape Yassin Kadi. 
During the March 4 interview, Flessner stated both that Appellee had
been requested Ato wire up
on the target or one of the targets coming out of a company@ in New Jersey and that an employee of BMI had contacted Appellee, and
they had asked him to Awire up@ and meet with him, but Flessner never specified whether Athe target or one of the targets@ was or was not Kadi.  Statement
Six essentially repeats the information in Statement Four, that Appellee
refused to record Aa Saudi
named Yassin Kadi,@ who was Asuspected of bankrolling Usama bin Laden.@  Lazure=s March 4 notes do not contain any information on Flessner=s point of view because he was unavailable for her to pre‑interview.

The only reference to secret
recording and Kadi in Lazure=s March 5 notes is the single sentence buried within the block of the
prior day=s
information, referring to Kadi=s Asuspected
associate,@ and, other
than a similar statement about Kadi financing Osama bin Laden, none of the new
facts about Kadi are mentioned by O=Reilly.[33]








During his March 6 interview
with Vincent, O=Reilly
asked, AAnd you wanted [Appellee] to record a Saudi who was under suspicion of
financing Osama bin Laden, correct?@  To which Vincent replied, A[I]ndirectly, yes,@ and then clarified that it was Aan official in an East Coast company that was under investigation by
Robert Wright=s case,@ who was a Muslim. 
Subsequently, O=Reilly
asked, AWas it al Qaeda?  Was itCbecause we heard it was Osama bin Laden=s outfit.@  Vincent replied, AWell, this is Yassin Kadi. 
He was involved in organizing or paying for this particular company . .
. [that] this fellow was working for.@  [Emphasis added.]  Lazure=s March 6 notes erroneously state in the title section pertaining to
Vincent, A[F]mr FBI
Special Agent (27 year veteran at bureau, who retired in Dec. 2002)CAgent Robert Wright was his partner; they were both in the room when
Muslim agent [Appellee] refused to wear wire to investigate Yassin Kadi.@  [Emphasis added.]








To prove malice, the
plaintiff must offer proof of the defendant=s state of mind at the time of publication.  Skeen, 159 S.W.3d at 637; New
Times, Inc., 146 S.W.3d at 162; see also Foster v. Upchurch, 624
S.W.2d 564, 566 (Tex.  1981) (AIt is not enough for a plaintiff to show that the defendant made a
mistake.@); Gonzales v. Hearst Corp., 930 S.W.2d 275, 277 (Tex. App.CHouston [14th Dist.] 1996, no writ) (stating that showing defendant
made a mistake or erred in judgment is not enough to prove actual malice
without also showing defendant=s state of mind).  The plaintiff
must present some evidence that the defendant purposefully published mistaken
facts or that the circumstances were Aso improbable that only a reckless publisher would have made the
mistake.@  Freedom Newspapers of Tex.
v. Cantu, 168 S.W.3d 847, 855 (Tex. 2005). 
Evidence that a report was mistaken, even negligently so, is not
evidence of actual malice.  Id.; Turner,
38 S.W.3d at 120 (AA publisher=s presentation of facts may be misleading, even negligently so, but is
not a >calculated falsehood= unless the publisher knows or strongly suspects that it is
misleading.@).








Here, there is no evidence
that O=Reilly knew he was mistaken or strongly suspected that he was mistaken
at the time he made Statements Four and Six. 
Instead, the record reflects that it was not until the Vincent interview
during the final broadcast on March 6 that the connections between Appellee=s wire issue and Kadi were made clear to O=Reilly.  Reviewed in the light
most favorable to Appellee, although O=Reilly failed to accurately capture all of the story=s details, here, the single line in the March 4 and March 5 notes,
this evidence suggests an error in judgment, rather than evidence of actual
malice, based on the lack of testimony that O=Reilly actually read any of Lazure=s notes.  See Huckabee,
19 S.W.3d at 426; Pardo v. Simons, 148 S.W.3d 181, 193 (Tex. App.CWaco 2004, no pet.); see also Soodeen v. Rychel, 802 S.W.2d
361, 363 (Tex. App.CHouston [1st
Dist.] 1990, writ denied) (stating that a party cannot avoid summary judgment
by relying on circumstantial evidence that is equally consistent with the
nonexistence of the fact the party seeks to prove); see also Hammerly Oaks,
Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex. 1997) (holding Ameager circumstantial evidence@ that could give rise to any number of inferences, none more probable
than another, is no evidence of an ultimate fact issue).  Therefore, we conclude that the portions of
Statements Three, Four, and Six referring to Kadi were not made with actual
malice. 

(3) Sami Al‑Arian Statements

O=Reilly mentioned Sami Al‑Arian in Statements Two, Three, Four,
Six, Nine, and Twelve. 

March 4 Broadcast








As addressed above, the
record establishes that O=Reilly wrote
Statement Three and that the statement parallels Lazure=s March 4 subject headline, AMuslim Agent refused to wear wire with Al‑Arian,@ the second paragraph of her notes, and her description of Wright=s point of view.[34]  Having reviewed the language used in
Statement Three, the March 4 broadcast in its entirety, the depositions of O=Reilly, Brown, and Lazure, Lazure=s affidavit and notes, and O=Reilly=s testimony
that he would not write Aanything
that [he] would not think is true,@ we conclude that there is no evidence that O=Reilly believed the statement was false, or that he had serious doubts
about its truth, at the time he made the Al-Arian portion of Statement
Three.  See Harte‑Hanks, 491
U.S. at 688, 109 S. Ct. at 2696; Skeen, 159 S.W.3d at 637.

March 5 Broadcast








With regard to Statements
Four and Six, although misattributed to Flessner in Statement Four, who stated
during the interview when asked about Al‑Arian, AI wasn=t involved,@ the information from Lazure=s March 4 notes supports O=Reilly=s assertions
that Wright made these accusations, and, as addressed above, there is no
evidence that O=Reilly
doubted Wright=s credibility.  Likewise, there is no evidence that O=Reilly made the statements doubting their truth or with a high degree
of awareness that they were false.[35]  See Harte‑Hanks, 491 U.S. at
688, 109 S. Ct. at 2696; Skeen, 159 S.W.3d at 637.

With regard to Statement
Twelve, O=Reilly
indicated that Flessner and Wright told him that Aeverybody@ wanted
Appellee to wear a wire, then stated, AThe Tampa office in the Al‑Arian case asked the man to wear a wire.  He declined.@  Appellee asserts that although
ATampa@ is given as
the source for the Al‑Arian information, Ain reality, [Appellant] had no information that [Appellee] had
actually refused to record Mr. Arian.@








Within Lazure=s March 4 notes about Wright=s point of view, Wright is credited with stating, A[S]omebody said, call Tampa, this isn=t the first time he=s [refused to wear a wire]. 
This is when I discovered he had refused to wear a wire to a meeting
with Al Arian.@  [Emphasis added.]  O=Reilly testified that he had not been aware of any credibility issues
with regard to Wright prior to the broadcast, and there is no evidence that O=Reilly either did not believe the statements attributed to Wright=s point of view in Lazure=s March 4 notes or that he had serious doubts about their truth.[36]  A media defendant=s poor choice of words or content, without more, does not amount to
actual malice.  Forbes Inc. v. Granada
Biosciences, Inc., 124 S.W.3d 167, 174 (Tex. 2003).  Because there is nothing in the record to
create a genuine issue of material fact with regard to Appellant=s subjective knowledge of falsity or reckless disregard thereof at the
time Statement Twelve was made, we conclude that there is no such issue.  See Pardo, 148 S.W.3d at 193 (stating
that a defendant=s failure to
capture accurately all of a story=s details may suggest an error in judgment but is no evidence of
actual malice).

March 6 Broadcast








With regard to O=Reilly=s final
mention of Appellee=s alleged
refusal to record Al‑Arian, Statement Nine, Appellee states that
Schippers never stated that Appellee refused to record a conversation and Athat jump is made by Defendant O=Reilly, who attributes it to >Tampa.=@  As discussed above with regard
to Wright=s comments
about calling Tampa and learning of Appellee=s alleged refusal to record Al-Arian, found in Lazure=s March 4 notes, and the language preceding Statement Nine from Schippers,
who stated that Al-Arian had called Appellee and A[a]ll [Appellee] had to do was put an overhear device on his
telephone,@ there is no
evidence that O=Reilly
believed Statement Nine was false or highly likely to be false when he made
it.  Therefore, with regard to the
portions of Statements Two, Three, Four Six, Nine, and Twelve pertaining to
Sami Al-Arian, we conclude that there is no evidence of actual malice.

(4) O=Reilly=s Presentation of Allegations as Athe truth@

Appellee states that, AIn the Broadcasts, Appellant O=Reilly presents allegations as >the truth.=  In fact, at the time of his statements, [he]
had no idea whether or not the allegations were true.@  Appellee also asserts that the
statements were reported as true, Awithout any attribution or first hand knowledge.@  Although, by the very
definition of Aactual
malice,@ Appellee=s first
contention eliminates the argument that Appellant knew the allegations
were false, we must still review the statements and Appellee=s summary judgment evidence for Areckless disregard.@  See WFAA‑TV, 978
S.W.2d at 571 (defining Aactual
malice@).  Statement Nine is the only
contested statement in which O=Reilly asserts Athe truth.@













We have found no evidence in
the record to support Appellee=s contention that O=Reilly=s statement
about Athe truth,@ when he
made it, was made with a high degree of awareness of its probable falsity and
serious doubt as to its  truth.  See Harte‑Hanks, 491 U.S. at
688, 109 S. Ct. at 2696; Skeen, 159 S.W.3d at 637.  It is not even entirely clear from the
language used whether O=Reilly was
asserting a belief that Wright and Vincent=s allegations were true, whether he was asserting that it was true
that he chose to believe Wright and Vincent, or both.[37]  Based on the entire record, after three days
of interviews, it would appear that O=Reilly had made up his mind about who he chose to believe out of all
of the information presented by his guests. 
See Brewer v. Capital Cities/ABC, Inc., 986 S.W.2d 636, 643 (Tex.
App.CFort Worth 1998, no pet.) (stating that there is no defamation
liability for a statement of opinion when a report sets out the underlying
facts in the publication itself, thereby allowing the listener to evaluate the
facts and either accept or reject the opinion).[38]

While inherently improbable
assertions and statements made on information that is obviously dubious may
show actual malice, there is no evidence in the record that O=Reilly either found the assertions made by his guests inherently
improbable, or, on the face of Lazure=s research and the Broadcast transcripts, that he considered the
information or the informants dubious.  See
Bentley, 94 S.W.3d at 596. 
Therefore, we conclude that Appellee failed to bring forth evidence to
create a genuine issue of material fact as to actual malice with regard to Statement
Nine.

(5) Remaining Statements








With regard to Statements
Five, Seven, Eight, Ten, and the remaining portions of Statements Six and
Eleven, having reviewed them against the transcripts, the Broadcasts in their
entirety, depositions of O=Reilly, Brown, and Lazure, and Lazure=s affidavit and notes, we conclude that there is no evidence in the
record to show a genuine issue of material fact as to actual malice.

Statement Five and the
remaining portion of Statement Six were made in the March 5 broadcast and
pertain to Appellee being put on administrative leave and being investigated by
the Justice Department=s Office of
Professional Responsibility.  Lazure=s March 4 notes state, ALast week, the FBI placed [Appellee] on administrative leave and
ordered him back to the United States.@[39] The unofficial FBI statement given to Lazure on March 4 states,

I cannot discuss the
circumstances regarding the placement of [Appellee] on administrative
leave.  I will say that it is in no way
connected with his work for the FBI in Saudi Arabia or the U.S.  We received information regarding matters
that happened before he had any connection to the FBI.  We have placed the agent on leave because it
is a pending investigation.  This is in
no way a national security matterCit is not even in that realm, and the decision to place him on leave
is in no way associated to terrorism.








In the sentences preceding
Statement Five, O=Reilly
stated that Appellee apparently denied any wrongdoing, had filed an equal
opportunity complaint against Wright, had been promoted, and then called back
and placed on forced leave, information supported by the facts in Lazure=s March 4 notes.  O=Reilly asked, AWhy?  The FBI will not say,@ and then made Statement Five.[40]  During the March 4 broadcast, Flessner told O=Reilly, AI=m not privy to what the reason is that they have suspended [Appellee],
but clearly, there=s something
big going on, since they=[v]e
recalled him for re-op.@  After reviewing Lazure=s March 4 notes, the March 4 interview with Flessner, and O=Reilly=s
deposition, there is no basis from which we may conclude that O=Reilly knew Statement Five and the similar portion of Statement Six[41]
were false or that he had serious doubts about their truth or falsity.  See Turner, 38 S.W.3d at 122‑23.








O=Reilly made Statement Seven[42]
during his interview with Baker and Statement Eight during his interview with
Aldrich.  Baker informed O=Reilly that when all of the facts were in, they would show that
Appellee did not make the decision about whether to wear a wire, and then O=Reilly made Statement Seven. 
Lazure=s March 4
notes include Wright=s point of
view, in which he stated that Appellee said, AA Muslim does not record another Muslim,@ there were five Aagents/prosecutors in the office in Chicago who heard the statement,@ and Anone of us
could believe it.@  Wright continued,

Then
I called headquarters telling them what happened, and I couldn=t
believe their response.  I thought the
guy would be terminated, but they basically said Ayou
have to understand where he=s coming from.@  I don=t understand where he=s
coming fromCwe
both took the same oath, and he was saying no. 
This sort of thing really undermines investigations.  I was so frustratedCand
somebody said, call Tampa, this isn=t the first time he=s
done this. 

 

During the March 4 broadcast,
Flessner, a former prosecutor and not an FBI agent, told O=Reilly that he was present when Appellee declined to wear the
wire.  Even though Wright alone is not Aseveral,@ Lazure=s notes indicated that at least five Aagents/prosecutors@ heard the alleged statement and Flessner told O=Reilly that he also heard the statement.  O=Reilly=s poor
choice of words, without any showing in his testimony to indicate that he
thought he was making a false statement during his interview with Baker, or
that he at least had serious doubts, does not create a genuine issue of
material fact with regard to actual malice. 
See Forbes Inc., 124 S.W.3d at 174.








The same analysis would apply
to Statement Eleven, in which O=Reilly asserted during the March 5 broadcast that he had Atwo eyewitnesses@ that
Appellee refused to wear a wire twice. 
Flessner and Wright claimed to have heard, not to have seen,
Appellee refuse to record another Muslim during the Chicago teleconference, and
Wright, not Flessner, asserted that Appellee had also done this in Florida,
based on Lazure=s March 4
notes on his point of view.  O=Reilly made this statement before his March 6 interview with Vincent,
another FBI agent who claimed to have heard Appellee make the alleged
statement. 








With regard to Statement
Eight, Aldrich brought up that a criterion for choosing an undercover agent was
his willingness to wear, or not to wear, a wire.  O=Reilly countered with, A[B]ut let=s face
it.  We don=t have very many Muslim American agents who can infiltrate terrorist
organizations,@ and then
made Statement Eight.[43]  Assuming that the question in Statement Eight
could constitute a statement of fact, there is nothing in the record to
indicate that O=Reilly asked
this question with actual malice. 

Finally, in Statement Ten, O=Reilly asked another question, AShould FBI Chief Robert Mueller be fired over the scandal of a Muslim
agent who failed to aggressively investigate terrorism?@  During his interview with
Aldrich, O=Reilly put
the adverb Aaggressively@ into context by intimating that risking death was part of an FBI
agent=s job.  O=Reilly testified that the story=s primary focus was AThe problem within the FBI, the controversy within the FBI.  If one agent, two agents saying this about
another agent, if the FBI not giving out information, that was the story,@ and that, when he did the stories in March 2003, he thought that the
controversy within the FBI was the story=s primary focus.  He also
testified that the question the Broadcasts raised over three nights was, A[D]id the FBI agent not tape a fellow Muslim suspect[?]@








Evidence that an article was
written Afrom a particular point of view, even when [the article is] hard‑hitting
or sensationalistic, is no evidence of actual malice.@  See Huckabee, 19 S.W.3d
at 425.  And, although in his subsequent
telephone conversation with Appellee, O=Reilly did acknowledge feeling Aa little bit responsible for this, because I don=t want you to have this kind of burden to walk around in the public
with,@ while trying to coax Appellee onto THE O=REILLY FACTOR,  O=Reilly actually stated, Aif this is unfair, if
you have been tainted, . . . we certainly will put you in the spotlight.@  [Emphasis added.]  There is no evidence in the record that at
the time O=Reilly made
Statement Ten, or any of the other statements at issue, he had any belief that
the statements were not true or had serious doubt about their truth.  Therefore, we conclude that, as to Statements
Five, Seven, Eight, Ten, and the remaining portions of Statements Six and
Eleven, there is no genuine issue of material fact with regard to actual
malice.

FOX=s Selection Of Reported Material

Appellee further argues that
he raised a genuine issue of material fact in response to the challenged
element of actual malice through evidence that FOX chose the material for its
BroadcastsCand thereby
omitted other material from its BroadcastsCwith actual malice.








A broadcast=s omission of facts may be actionable if it so distorts the viewers= perception that they receive a substantially false impression of the
event.  Huckabee, 19 S.W.3d at
425.  A public figure or public official
seeking to recover for such an omission must, however, make Athe familiar showing that the publisher selected the material with
actual malice.@  Id.  Thus, for an omission to be evidence of actual
malice, the plaintiff must prove that the publisher knew or strongly suspected
that it could create a substantially false impression.  Turner, 38 S.W.3d at 121.  Evidence that a defendant selectively omitted
facts to purposefully create a false portrayal of events may satisfy this
test.  Huckabee, 19 S.W.3d at
426.  Moreover, an omission may be so glaring
and may result in such a gross distortion that by itself it constitutes some
evidence of actual malice.  Id.  AIn such a case, the omission so changes the character of the story
that one could infer that the defendant knew, or at least suspected, that the
omission would convey a false impression.@  Id.  A failure to capture accurately all the story=s details, however, suggests an error in judgment, which is no
evidence of actual malice.  Id.








Here, as evidence of actual
malice, Appellee points to O=Reilly=s statements
that Appellee refused to record Al-Kadi, an alleged financier of Osama
bin-Laden.  According to Appellee, Lazure=s notes make it clear that the 1999 incident involved a Asuspected associate@ of Al-Kadi, not Al-Kadi himself. 
This is merely evidence that O=Reilly failed to accurately capture all of the story=s details.  O=Reilly=s statements
that Appellee refused to record Al-Kadi instead of a Asuspected associate@ of Al-Kadi suggest that he made an error in judgment.  Although this might constitute negligence on
the part of O=Reilly, it
is not evidence that O=Reilly
selectively omitted this fact to purposefully create a false portrayal of the
event.  Moreover, having considered the
entirety of the Broadcasts, we cannot conclude that the omission was so glaring
that it grossly distorted the event being reported such that one could infer
that O=Reilly knew, or at least suspected, that the omission would convey a
false impression.  See Huckabee,
19 S.W.3d at 426.  Because this evidence
does not demonstrate that O=Reilly knew or strongly suspected that the omission could create a
substantially false impression, it is no evidence of actual malice.  See Turner, 38 S.W.3d at 121.








As evidence of actual malice,
Appellee next points to O=Reilly=s failure to state or otherwise indicate that the decision to not go
through with the recording was ultimately made by FBI management in the Dallas
office, not solely by Appellee. 
According to Appellee, although O=Reilly was aware of the FBI=s decision-making process, he failed to state as much during the
Broadcasts, thus allegedly creating a false impression that Appellee
single-handedly stopped the investigation of Al-Kadi.  We held above that, even indulging every
reasonable inference in Appellee=s favor, a plain reading of O=Reilly=s comments
about Mueller, Wright, and the FBI indicated that O=Reilly did not have a clear picture about how the FBI hierarchy worked
and how decisions were made within the agency. 
Without such an understanding, O=Reilly could not have known or strongly suspected that the omission
could create a substantially false impression. 
Moreover, as above, we cannot say that the omission was so glaring that
it grossly distorted the event being reported such that one could infer that O=Reilly knew, or at least suspected, that the omission would convey a
false impression.  See Huckabee,
19 S.W.3d at 426.  Accordingly, O=Reilly=s failure to
explain the FBI decision-making process is no evidence of actual malice.  See Turner, 38 S.W.3d at 121.








Appellee also contends that
actual malice is demonstrated by O=Reilly=s statements
that Appellee Arefused an
order@ because, according to Appellee, he was never ordered to partake in
the recording.  He reasons that O=Reilly=s choice of
words raised the issue of Ainsubordination,@ implying
that Appellee is a Atraitor@ and a Acriminal.@  Appellee=s argument mischaracterizes the substance of the challenged statements
because in none of them does O=Reilly state that Appellee refused Aan order.@  Rather, O=Reilly states that Appellee refused to Arecord other Muslims,@ Awear a
recording device,@ and Awear a wire.@  He also states that Appellee Adeclined to secretly tape a Saudi citizen.@  O=Reilly thus could not have known or strongly suspected that the
complained of statements could create a substantially false impression because
he never made those statements.  See
Turner, 38 S.W.3d at 121.  To the
extent that Appellee argues that O=Reilly=s use of the
word Arefuse@ is evidence
of actual malice because Appellee never actually refused to perform an order,
Appellee states in his affidavit that he Adid not want to engage in secret
recording of the individual for a number of reasons@ and that he Adid not want
to engage in covert recording.@  [Emphasis added.]  O=Reilly=s statements
characterizing Appellee=s action as
a Arefusal@ to do those
things as opposed to stating (as Appellee does in his own affidavit) that
Appellee Adid not want
to@ do those things is not such a glaring or gross distortion that it
constitutes some evidence of actual malice in and of itself, as Appellee seems
to argue.  There is no evidence that O=Reilly knew or strongly suspected that his use of the word Arefuse@ could
create a substantially false impression. 
See Turner, 38 S.W.3d at 121.

CONCLUSION

Because we conclude that
there was no evidence of actual malice with regard to Appellee=s contentions addressed in Appellant=s motion for summary judgment, we sustain Appellant=s fourth issue.  We need not
consider the other grounds raised in the motion for summary judgment and in
this appeal.  See HBO, 995 S.W.2d
at 163; see also Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 626
(Tex. 1996) (holding that courts of appeals should consider all summary
judgment grounds that are necessary for final disposition of the request
earnestly).

 

 

 








We reverse the judgment of
the trial court and render judgment that Appellee take nothing.

 

 

 

DIXON W. HOLMAN

JUSTICE

 

PANEL
A:  CAYCE, C.J.; HOLMAN and GARDNER, JJ.

 

DELIVERED:  November 15, 2007











[1]We refer to FOX Entertainment
Group, Inc., FOX Broadcasting Company, FOX News, Inc., FOX News Network, Inc.,
FOX News Network, L.L.C., FOX News Holdings, Inc., and Bill O=Reilly generally as AAppellant@ except where otherwise noted. 





[2]Appellee also sued ABC, Inc., ABC
News, Inc., ABC News Holding Company, Inc., Disney Enterprises, Inc., WFAA‑TV,
L.P., WFAA of Texas, Inc., Belo Corp., Charles Gibson, Brian Ross, Wright, and
Vincent, for statements made in similar ABC broadcasts and transcript postings,
and alleged the same or similar defamation‑based claims in the 67th
District Court of Tarrant County, Texas, in trial court cause number 067‑203396‑03.  Brian Ross is the ABC News chief
investigative correspondent responsible for ABC=s December 2002 broadcast.  The parties in both suits made a rule 11
agreement providing that depositions from either case could be used in both
cases.  See Tex. R. Civ. P. 11.

The 67th district court
sustained Wright=s and Vincent=s pleas to the jurisdiction and
Disney Enterprises, Inc.=s special appearance, dismissed the
claims against Belo Corp., WFAA‑TV, L.P., and WFAA of Texas, Inc., and
granted the remaining defendants= motion for summary judgment.





[3]Yassin Al-Kadi, Yasin Kadi, Yassin
Qadi, and other variations refer to the same individual.





[4]Usama bin Laden and Osama bin Laden
refer to the same person.





[5]According to Wright, Vulgar
Betrayal led to a seizure in June 1998 of $1.4 million of Middle Eastern
terrorist funding linked directly to Saudi businessman Yasin Qadi, who was
designated a financial supporter of Osama bin Laden in October 2001.  In Wright=s June 1998 affidavit seeking this civil asset forfeiture,
he described the relationship of Yassin Kadi, Kadi International, and its
related entity, BMI, Inc., of New Jersey, to terrorism suspects involved in a
money‑laundering scheme.





[6]In his first amended petition,
Appellee claimed that he was a private individual.  However, Appellee argues in his appellate
brief that A[t]here is a genuine issue of
material fact as to actual malice@ and does not dispute Appellant=s contention in its brief that he
is a public figure.  Therefore, for
purposes of our review, we assume that Appellee was a public official, a public
figure, or a limited purpose public figure. 
See Tex. R. App. P. 38.1(f);
W. Steel Co. v. Altenburg, 206 S.W.3d 121, 124 (Tex. 2006) (AAn appellate court normally accepts
as true the facts stated in an appellate brief unless the opposing party contradicts
them.@).





[7]To recover for defamation, a public
figure suing a media defendant has the burden to prove that defamatory
statements made about him were false.  See
Bentley v. Bunton, 94 S.W.3d 561, 586 (Tex. 2002).  However, as we resolve Appellant=s no‑evidence claims here on
the issue of whether Appellee raised a genuine issue of material fact as to
actual malice, we need not consider whether Appellant=s Broadcasts either expressly or
implicitly made false statements about Appellee.  See Tex.
R. App. P. 47.1. 





[8]The written transcripts were
included in the voluminous summary judgment evidence presented to the trial
court.





[9]The FBI=s official statement of December
19, 2002, sent to ABC, was included in the record.  The statement refers to Athe alleged refusal to wear a
recording device@ and states that the location of
the meeting was in a mosque. The official statement does not disclose with whom
the meeting was to be conducted, referring only to Aa subject of the investigation.@ 
Appellee testified that the FBI=s official statement was incorrect with regard to its
assertion that the meeting=s location was in a mosque.





[10]See Newdow v. U.S. Congress, 328 F.3d 466 (9th Cir. 2003), rev=d sub nom. Elk Grove Unified Sch.
Dist. v. Newdow,
542 U.S. 1, 124 S. Ct. 2301 (2004).





[11]A Avoice over@ is an introductory narration for a
story.





[12]These are also referred to in the
record as Ainformation packets.@





[13]Both parties submitted deposition
excerpts from O=Reilly, Brown, and Lazure and
affidavits from Lazure and Brown.  We
infer that Appellee=s reference to Athe affidavit of . . . O=Reilly attached to the FOX
Defendant=s motion,@ actually refers to O=Reilly=s deposition, as no affidavit by O=Reilly was submitted by Appellant
with its motion for summary judgment.  In
his supplemental response to Appellant=s motion for summary judgment, Appellee included additional
excerpts of O=Reilly=s deposition.  Appellee also submitted his own affidavit and
listed deposition excerpts from Danny Defenbaugh, Ross, and Wright.  However, we infer that Appellee actually
meant Timothy Gossfeld instead of Ross, as he attached Gossfeld=s, and not Ross=s, deposition to his response.  There is no deposition of Ross in the record
and the only evidence, submitted by Appellant, with regard to a ARoss@ is the affidavit of Brian Ross, an
ABC News correspondent not at issue here. 
Gossfeld was Wright=s former supervisor in the Chicago FBI office.  Defenbaugh was the special agent in charge of
the Dallas FBI office in 1999.





[14]Appellee also attached deposition
excerpts from Defenbaugh, but Defenbaugh only testified that he spoke with Apossibly somebody from the media@ and that he would never have told
anyone that the decision to not wear a wire was Appellee=s. 
He testified that he would have been the one to decide whether Appellee
would wear a wire.





[15]He repeated this later in the
deposition, stating, ALook, we saw the story [about
Appellee], we put it into motion, we investigated it, we got our three primary
sources, and we put it on the air.@





[16]The FBI did not provide an official
statement to FOX, but it did provide one to ABC.





[17]The Wall Street Journal article,
entitled, AMuslim FBI Agent is Accused of Not
Taping Terror Suspects,@ was published on November 26,
2002.  The article contained Wright=s and Carmody=s allegations and stated that the
allegations were first made in 2000 Ain response to an internal discrimination complaint filed
against the FBI by the Muslim agent, Gamal Abdel‑Hafiz, then stationed in
Dallas.@ 
The article indicated that Wright=s affidavit in response to the internal complaint,
including the allegation that Appellee refused to wear a hidden microphone and
said that A[a] Muslim does not record another
Muslim,@ was released by the FBI under the
Freedom of Information Act.  The article
stated that Wright alleged that Appellee refused to cooperate with an FBI probe
into BMI, Inc., a company Athat figure[d] in government investigations of Yassin Qadi,
a Saudi businessman whom the U.S. government says is a supporter of terrorism.@





[18]O=Reilly twice asked the question
about whether Appellee refused to secretly tape other Muslims involved in
terror investigations and stated, AWe need to know if [Appellee] refused to wear a wire during
a terrorism investigation and why he was subsequently promoted.@ 
These questions and statement are not included in the challenged
statements.





[19]Lazure=s March 6 notes include Ianarelli=s unofficial statement about the
FBI=s procedural concerns with regard
to recording and the Fourth Amendment, but contain nothing about Appellee=s asserted procedural concerns.  Appellee gives no hint in any of his
pleadings regarding what his Aprocedural concerns@ involved.





[20]It does not explain, for example,
the distinction between the Chicago and Dallas FBI offices, and who had the
right to order or to request that Appellee wear a wire, discussed below.





[21]Not until his deposition, three
years later, did O=Reilly even restate one of the
issues underlying the Broadcasts as Awhether an FBI agent refused an order to tape
another Muslim.@ 
[Emphasis added.]  However, the
issue here is not the truth of whether Appellee actually received an order and
refused to follow itCthe issue here is whether O=Reilly published the challenged
statements with knowledge that they were false or with reckless disregard as to
their truth or falsity.





[22]In Gossfeld=s testimony, he distinguished the
Chicago FBI=s Arequest@ from an Aorder,@ stating, AIt=s a request from the Chicago FBI
office, which would have been made to the Dallas FBI office, and the agents in
Dallas would be under the command structure of the Dallas management.@ 
It is undisputed that Appellant did not contact Gossfeld.





[23]His personal invitation to Appellee
after the Broadcasts also tends to support this, although Appellee had been
fired by that time.  On October 18, 19,
and 20, 2003, Appellee was interviewed by CBS 11 about his termination from the
FBI.  He blamed his termination on the
allegations that he refused to wiretap fellow Muslims and bias against Muslims
within the government.

On October 20, 2003, O=Reilly called Appellee and invited
him to come on his show to put forth his point of view.  A transcript of their phone conversation was
included in the record because Appellee recorded it.  O=Reilly indicated at his deposition that this was the first
time he had notice that Appellee had tape recorded him and remarked, A[I]t is certainly unprofessional to
tape somebody without telling them.@





[24]This is part of Statement
Nine.  Schippers had said, AIt was the same with Sami
Al-Arian.  That wasn=t even wearing a wire.  Arian called him and asked to talk to
him.  All he had to do was put an
overhear device on his telephone and nobody in the world would have known that
he was . . . .A 
Lazure=s program notes for all three
Broadcasts indicate that Wright said that one of the refusal incidents was in
1998, Awhen [Appellee] refused to record a
conversation with Sami Al-Arian, who was being investigated in Tampa.@





[25]This is the other part of Statement
Nine.  We discuss O=Reilly=s assertion about Athe truth@ below.





[26]This statement, quoting Wright, was
also made in the Wall Street Journal article that O=Reilly testified piqued his
interest in the story.





[27]These statements also include a
reference to Sami Al‑Arian, as discussed below.





[28]Appellant also contends that the
actual identity of the Muslim suspect was Aa matter of secondary importance,@ as the Agist@ of the Broadcasts remained the
same with regard to the allegations made by Wright, Vincent, Flessner, and
Carmody.





[29]He also testified that, with regard
to what he said about Kadi, Awe raised the question@ and Athat this was the accusation, not
only there but on a number of other occasions, that this was the accusation.@





[30]The first sentence of the third
paragraph of Lazure=s March 4 notes states, AIn April 1999, [Appellee] also
refused to secretly record a conversation with one of Yassin Kadi=s suspected associates, who was a Muslim.@ [Emphasis added.]  Her notes on Wright=s point of view merely state that
it was the investigation of a businessman suspected of financial links to AUBL,@ and, in her notes on Afacts/stats,@ she included the following
information:

 

Cin Dec., Wright told ABCNEWS that
the Clinton‑Reno Justice Department refused to allow him to investigate a
key figure (Yassin Kadi) tied to UBLChe said he pressed for authorization to open a criminal
investigation into a money trail that lead from a suspected terrorism cell in
Chicago to UBLChis supervisor stopped himChis attorneys filed suit against
the Justice Dept over the episode[.]

 

 





[31]In Statement Ten, O=Reilly stated, AShould FBI Chief Robert Mueller be
fired over the scandal of a Muslim agent who failed to aggressively investigate
terrorism?@ 
The subject headline of Lazure=s March 5 notes state, FBI FOLLOW‑UPCShould FBI chief Robert Mueller be
blamed because a Muslim agent failed to aggressively investigate Muslim
suspects?  Has leadership gotten any
better under Mueller than it was under Freeh?@





[32]In his Talking Points memo, O=Reilly specifically referenced the Aoffice of professional
responsibility at the Justice Department@ investigating Appellee. 
Lazure=s March 4 and 5 notes only state
that Athe FBI placed [Appellee] on
administrative leave.@ 
O=Reilly also talked about Mueller=s action in Boston as a federal
prosecutor, special praise given by Mueller to Bowman even after the Moussaoui
computer incident, and the fact that Rowley was not commended and Bowman
was.  He also makes general reference to Agrowing evidence that Mueller is a
bureaucratic nightmare@ and asserted that many FBI field
agents Arefer to Mueller=s Washington group as >hindquarters= instead of >headquarters.=@ 
None of these facts are contained in Lazure=s March 5 notes.

O=Reilly does mention that Wright Ais writing a book, but was told
that he would be charged with insubordination if he appeared on THE FACTOR last
night.@ 
The two new sentences added to the large block of March 4 text in the
March 5 notes are AWright has written a 500‑page
book called >Fatal Betrayal,= which he says the bureau won=t let [him] publish.  The bureau also pressured him into NOT doing
the program last night.@





[33]O=Reilly=s statement refers to Aa Saudi citizen named Yassin Kadi,
who was suspected of financing Usama bin Laden.@ 
Lazure=s notes state that the U.S.
Treasury Department froze Kadi=s assets, Aalleging that his Blessed Relief charity had funneled money
to Osama bin Laden.@





[34]The second paragraph states:

 

Chicago FBI counter‑terrorism
agent Robert Wright, who was one of the whistleblowers on [Appellee=s] refusal to wear a wire in 1999,
now says that one of these incidents was in 1998, when [Appellee] refused to
record a conversation with Sami Al‑Arian, who was being investigated in
Tampa.  Agent Wright learned about
the Al‑Arian incident in 1999 when [Appellee] again refused to wear a
wire to record a Muslim. [Emphasis added.]

 





[35]The only portion of Statement Four
not specifically complained of by Appellee is the only part without direct
support in the record, in which O=Reilly stated, AHundreds of Muslim American law enforcement agents have
worn wires, according to FACTOR sources.@  However, there is
no evidence that O=Reilly did not believe this
statement to be true or that he had a serious doubt about its truth or falsity.






[36]This is assuming that O=Reilly read the March 4 notes, as
discussed above, and did not have this information from some other source not
in the record.  Brown testified that O=Reilly had previously had Al‑Arian
as a guest and then did follow‑up interviews about him, and in Wright=s point of view statement, he
stated, AI credit O=Reilly with Sami Al Arian getting
taken down.@





[37]In response to Schippers= assertion that the FBI was hiding
something and his question, AAren=t they interested in finding the
truth?@ 
O=Reilly made Statement Nine, AListen, we know the truth.  The truth is I believe your two agents here,
this guy wouldn=t tape other Muslims.  That=s the truth.  And he
wasn=t disciplined.@ 

Also, part of O=Reilly=s reporting style, revealed through
the review of the three Broadcasts in their totality, appears to be asserting
whether something is Atrue@ during interviews in response to
guest information.  For example, during
the March 4 broadcast, he responded, Ayes, that=s not true,@ in agreement with one of Flessner=s statements and Athat=s true@ in his constitutional law
discussion.  





[38]Under federal law, while a
statement of opinion relating to matters of public concern that does not
contain a provably false factual connotation will receive full constitutional
protection, an Aopinion@ that reasonably implies false and
defamatory facts may be actionable. 
See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 110 S. Ct.
2695, 2706 (1990).  Where a statement of Aopinion@ on a matter of public concern does
reasonably imply false and defamatory facts regarding a public figure, that
individual must show that the statement was made with knowledge of its false
implication or with reckless disregard of its truth.  Id., 110 S. Ct. at 2706‑07.  There is no evidence in the record that
showing that O=Reilly knew he was making a false
implication or that he had serious doubts about its truth at the time he made
Statement Nine.





[39]O=Reilly also stated this in his
introduction to the Impact Segment in the March 4 broadcast.





[40]ABut THE FACTOR has learned that
Hafiz is being investigated by the office of professional responsibility at the
Justice Department.  That=s serious.@ 





[41]A[A]s we told you in the >Talking Points= memo, an FBI Agent named
[Appellee] has been put on administrative leave.@





[42]AICI just want toCI just want the audience to know,
Mr. Baker, that what you say, although it might be true, is being vehemently
disputedCvehemently disputedCby a number of FBI agents involved
in these investigations.@





[43]Statement Eight: AIf you have one that says, I=m not going to record another
fellow Muslim, you=ve got to fire him, don=t you?@ 
We note that if O=Reilly had read Lazure=s March 5 notes with regard to
Aldrich=s point of view, he might have
asked a more specific question.  Aldrich
stated in his point of view:

 

If in fact this agent refused to
wear a wire, this is atrocious.  He needs
to hand in his credentials and badge, because we all take an oath to the
constitution, not the . . . koran.  He
was probably up for promotion, and the decision was made that what he did wasn=t bad enough to open the bureau up
to criticism for renegging a promotion. 
I don=t believe this would ever have
happened under MuellerCbut it doesn=t surprise me that it happened
under Freeh.  He never took a strong
principled stand on anything.